IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 4, 1998 Session

## WILLIAM C. MARTIN v. DOUGLAS M. SIZEMORE, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 95-170-III     Ellen Hobbs Lyle, Chancellor**

---

**No. M1997-00203-COA-R3-CV - Filed August 22, 2001**

---

This appeal involves a disciplinary proceeding against a licensed architect. Following a lengthy hearing, the Tennessee Board of Examiners for Architects and Engineers concluded that the architect had engaged in misconduct in the practice of architecture in connection with four projects and suspended his certificate of registration for three years. The architect appealed the Board's decision to the Chancery Court for Davidson County. The trial court reversed the Board's decision after determining that the decision was not supported by substantial and material evidence. On this appeal, the Board asserts that its suspension of the architect's certificate of registration has adequate evidentiary support. The architect renews his argument that the Board's proceedings violated his procedural due process rights because the attorney who prosecuted the State's case against him also served as the Board's lawyer in other matters. Except for a portion of the charges involving one project, we concur with the trial court's conclusion that the Board's decision lacked evidentiary support because the State failed to present expert testimony regarding the applicable standard of care. We have also determined that the architect has not carried his burden of demonstrating that the Board was actually biased against him because the lawyer who prosecuted the State's case also provided other, unrelated legal services to the Board. Accordingly, we affirm the trial court's judgment as modified herein and remand the case to the Board for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which HENRY F. TODD, P.J., M.S., and WILLIAM B. CAIN, J., joined.

Paul G. Summers, Attorney General and Reporter, and Sara L. Rosson, Deputy Attorney General, Nashville, Tennessee, for the appellants, Douglas M. Sizemore, Tennessee State Board of Architectural and Engineering Examiners, Theodore E. Wynne, William H. Beaty, Ronald V. Gobble, David O. Lose, Richard A. Piske, Jr., Gary L. Rowe, John W. Smith, Linda E. Smith, and Willard Vance Travis, Jr.

David N. Garst, Knoxville, Tennessee, for the appellee, William C. Martin.

**OPINION**
**I.**

William C. Martin received his certificate to practice architecture in Tennessee in 1969. He has been working as a sole practitioner in the Knoxville area ever since. In May 1992, the State filed

a notice of charges with the Tennessee Board of Examiners for Architects and Engineers ("Board"), alleging that Mr. Martin had engaged in unprofessional conduct on four projects between late 1986 and early 1989. The State asserted that Mr. Martin's certificate should be suspended or revoked because (1) he was not competent to prepare the plans for a three-story motel and commercial building in Pigeon Forge and that the "deficiencies" in his structural plans "contributed" to the collapse of the structure in April 1987, (2) he was not competent to prepare the structural and electrical drawings for a seven-story motel project in Gatlinburg, (3) he permitted a client to construct and occupy an old grocery store converted into an automotive body shop when he knew that the Knox County Fire Prevention Bureau had issued a stop-work order on the project, and (4) he failed to submit acceptable electrical design drawings for a proposed motel in Townsend to the State Fire Marshal in a timely manner and that he permitted his client to substantially complete the project even though the plans contained numerous deficiencies.

In July 1993, Mr. Martin responded to the notice of charges by asserting that he had complied with the applicable standards of professional conduct for each of these projects. He also interposed numerous defenses to the notice of charges, including assertions that the rules of professional conduct were vague, that the State was engaging in selective enforcement, and that the use of lawyers furnished by the Department of Commerce and Insurance ("Department") to prosecute him amounted to a constitutionally impermissible combination of the prosecutorial and adjudicatory functions. Less than one month later, Mr. Martin stepped up his attack on the fairness of the proceedings by moving to disqualify the Department's lawyers from prosecuting the State's case against him. In January 1994, an administrative law judge, assigned to preside over the hearing by the Secretary of State, denied Mr. Martin's motion to disqualify the Department's lawyers because they were not assisting or advising the Board with regard to the case against Mr. Martin.

Mr. Martin was not deterred by the administrative law judge's denial of his motion to disqualify the Department's lawyers. On the eve of the administrative hearing, he filed a motion to disqualify all nine members of the Board for bias, prejudice, and interest in the outcome of the proceedings. The basis for this motion was that the board members had an attorney-client relationship with the Department's lawyer who would be prosecuting the case against him. After the administrative hearings commenced on February 17, 1994, one of Mr. Martin's attorneys was permitted to argue to the Board that their relationship with the Department's lawyer prosecuting the case required them to disqualify themselves. Thereafter, each board member present declined to recuse himself or herself from the proceeding.

Following five days of hearings, the Board entered a final order on November 18, 1994. The Board found: (1) that Mr. Martin was "not competent to have prepared or supervised the preparation of the structural, mechanical, plumbing, or electrical engineering drawings" for the motel project in Pigeon Forge that collapsed, (2) that Mr. Martin was "not competent to have prepared or supervised the preparation of the preliminary structural or electrical design drawings" for the seven-story motel in Gatlinburg, (3) that Mr. Martin did not act properly when he failed to withdraw from the converted grocery store project in Knoxville when the owner constructed and occupied the improvements contrary to a stop-work order issued by the Knox County Fire Prevention Bureau, and (4) that Mr. Martin had failed to communicate adequately with the State Fire Marshal in connection with the completion and approval of the plans for the Townsend motel project and had practiced outside the area of his competence by preparing the project's electrical design drawings. Accordingly, the Board determined that Mr. Martin had violated the rules of professional conduct,

that his license should be suspended for three years, and that he should be placed on probation for one year following the suspension. The Board later denied Mr. Martin's request for a stay of its order.

In January 1995, Mr. Martin filed a petition for judicial review in the Chancery Court for Davidson County, naming as defendants the Commissioner of Commerce and Insurance,[1] the Board, and the individual members of the Board. His attack on the Board's decision was twofold. First, he argued that the Board's proceedings violated U.S. Const. amend. XIV, Tenn. Const. art. I, § 8, and Tenn. Code Ann. § 4-5-303 (1998) because of the relationship between the board members and the Department's lawyer who prosecuted the State's case. Second, he asserted that the Board's conclusion that he had violated the rules of processional conduct with regard to the four projects was not supported by substantial and material evidence. The trial court rejected Mr. Martin's contention that the relationship between the Board and the Department's lawyer who prosecuted Mr. Martin caused the administrative proceedings to be fundamentally unfair. However, the trial court also determined that the Board's conclusion that Mr. Martin's conduct on the four cited projects violated the applicable standard of care was not supported by substantial and material evidence. Accordingly, it reversed the three-year suspension of Mr. Martin's certificate, as well as the decision to place Mr. Martin on probation for one year.

## II.
### THE CHALLENGE TO THE BOARD'S IMPARTIALITY

We will first address Mr. Martin's assertion that these proceedings were so fundamentally unfair that they denied him due process of law. Specifically, Mr. Martin asserts that the fact that the lawyer prosecuting the charges against him also serves as the Board's legal advisor in other unrelated matters undermined the Board's impartiality or, at least, created an appearance of unfairness. The contention is based solely on the nature of the relationship between the Board and the prosecuting lawyer. Mr. Martin neither alleged nor proved any specific conduct on the part of either the Board or the lawyer that would impugn the fairness of the proceeding. In the absence of proof of actual bias on the part of any Board member, we have determined that this proceeding conformed to the requirements of due process and complied with Tenn. Code Ann. § 4-5-303.

### A.

The State commenced this disciplinary proceeding against Mr. Martin in May 1992. Thereafter, the Board requested the Secretary of State to provide an administrative law judge to assist with the contested case hearing and to address all preliminary procedural matters. The Secretary of State acceded to the Board's request and appointed one of his employees to act as the administrative law judge in this proceeding.

Over one year later, Mr. Martin moved to disqualify Thaddeus E. Watkins, III, the lawyer prosecuting the charges against him, from participating further in the case. He argued that Mr.

---

[1] Allan Curtis, the Commissioner of Commerce and Insurance at the time of the administrative proceedings against Mr. Martin, has been replaced by Douglas M. Sizemore. In accordance with Tenn. R. App. P. 19(c), Commissioner Sizemore has been substituted for Commissioner Curtis, and the style of the case has been changed accordingly.

Watkins had been assigned to the Board to provide general legal advice and that permitting Mr. Watkins to present the State's case would place him "in the anomalous position of having to defend himself in an action being prosecuted before the Board by the Board's own attorney . . .." Mr. Martin asserted that Mr. Watkins's continued involvement with this case was contrary to Tenn. Code Ann. § 4-5-303 and deprived him of due process of law in violation of the state and federal constitutions.

The State opposed the disqualification motion. It asserted that Mr. Watkins was a lawyer employed by the Department of Commerce and Insurance and that he had been assigned to the Board to provide "administrative legal services" pursuant to Tenn. Code Ann. § 4-3-1304 (1998). Despite the fact that Mr. Watkins had signed the original notice of charges against Mr. Martin, the State asserted that an inappropriate combination of functions proscribed by Tenn. Code Ann. § 4-5-303 did not exist because the administrative law judge, not Mr. Watkins, would be serving as the Board's legal advisor in the contested case proceeding. Specifically, the State asserted that "[t]he State's counsel . . . do not render legal advice or assistance to the Board in contested case proceedings, but instead serve as prosecuting attorneys on behalf of the State after such proceedings are authorized by the Board." On November 4, 1993, the administrative law judge denied Mr. Martin's motion to disqualify Mr. Watkins on the ground that he was not assisting or advising the Board in these proceedings.

Mr. Martin immediately requested the administrative law judge to reconsider his November 4, 1993 order, complaining that the parties had agreed to take up the question of Mr. Watkins's disqualification when the contested case hearing convened. He also asserted that he had effectively been deprived of an opportunity to present evidence and to file a brief on the disqualification issue. On January 14, 1994, at the administrative law judge's direction, Mr. Martin filed a memorandum of law in support of his motion to disqualify Mr. Watkins. He also submitted the affidavit of Robert D. Holsaple, an architect who had served as the Board's chairperson, detailing the close working relationship between the Board and Mr. Watkins and the extent to which the Board relied on Mr. Watkins's advice and assistance. On January 26, 1994, the administrative law judge denied the motion to disqualify Mr. Watkins and his associates because they were not assisting the Board with regard to the charges against Mr. Martin. In his order, the administrative law judge noted that "[a] mere advantage because of familiarity does not amount to a denial of due process."[2]

The administrative law judge's order did not end the disqualification dispute. On February 10, 1994, one week before the scheduled start of the contested case hearing, Mr. Martin filed a motion seeking the disqualification of all members of the Board. He asserted that the Board members could not be impartial triers-of-fact because of their long-standing relationship with Mr. Watkins and the other lawyers employed by the Division of Regulatory Boards. The State opposed this motion.

_____

[2]The administrative law judge also observed that "administrative hearings would be less open to criticism if Attorneys General argued cases before Boards. But, absent a showing of actual prejudice (the type which T.C.A. § 4-5-302, in any case, is designed to correct) this judge cannot rule for the Respondent. While the current procedures are less than perfect the law only guarantees the right of due process, not perfection. Finally, it should be noted that the APA provides for judicial review of State agency decisions. Thus, the Respondent's rights are further protected by judicial review."

The Board members themselves entertained the disqualification motion when the contested case hearing commenced on February 17, 1994. After hearing arguments from both Mr. Martin and the State, each member of the Board individually declined to remove himself or herself from the case. Each Board member stated, in turn, that he or she could hear the case impartially, notwithstanding the relationship between the Board and Mr. Watkins and his associates.

**B.**

The Due Process Clause of the Fourteenth Amendment and Tenn. Const. art. I, § 8 provide similar procedural protections and guarantees. *Riggs v. Burson*, 941 S.W.2d 44, 51 (Tenn. 1997); *State v. AAA Aaron's Action Agency Bail Bonds, Inc.*, 993 S.W.2d 81, 85 (Tenn. Crim. App. 1998); *Eye Clinic, P.C. v. Jackson-Madison County Gen. Hosp.*, 986 S.W.2d 565, 578 (Tenn. Ct. App. 1998). Both provisions provide procedural protections for property and liberty interests against arbitrary governmental interference. *Armstrong v. Department of Veterans Affairs*, 959 S.W.2d 595, 598 (Tenn. Ct. App. 1997). While they contain a guarantee of fair process, *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 983 (1990); *Daniels v. Williams*, 474 U.S. 327, 337, 106 S. Ct. 677, 678 (1986), they do not prevent the deprivation of property interests. Rather, procedural due process guards against unfair or mistaken deprivations of property interests. *Fuentes v. Shevin*, 407 U.S. 67, 80-81, 92 S. Ct. 1983, 1994 (1972).

The threshold consideration with regard to any procedural due process claim is whether the plaintiff has a liberty or property interest that is entitled to protection under U.S. Const. amend. XIV, § 1 and Tenn. Const. art. I, § 8. *Rowe v. Board of Educ.*, 938 S.W.2d 351, 354 (Tenn. 1996); *Armstrong v. Department of Veterans Affairs*, 959 S.W.2d at 597-98. To qualify for constitutional protection, a property interest must be more than a "unilateral expectation" or an "abstract need or desire." It must be a "legitimate claim of entitlement" created and defined by "existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972); *Rowe v. Board of Educ.*, 938 S.W.2d at 354; *Eye Clinic, P.C. v. Jackson-Madison County Gen. Hosp.*, 986 S.W.2d at 578.

The types of interests entitled to protection as property interests are varied. However, they share the common characteristic that they are an individual entitlement, grounded in state law, that cannot be removed except "for cause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430, 102 S. Ct. 1148, 1155 (1982); *Armstrong v. Department of Veterans Affairs*, 959 S.W.2d at 598. The United States Supreme Court has recognized the constitutional significance of a person's interest in remaining employed. *Gilbert v. Homar*, 520 U.S. 924, 932, 117 S. Ct. 1807, 1813 (1997); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543, 105 S. Ct. 1487, 1494 (1985). Thus, the right to engage in a chosen profession or occupation without unreasonable governmental interference or deprivation is both a property and a liberty interest protected by the Due Process Clause of the Fourteenth Amendment and Tenn. Const. art. I, § 8. *Green v. McElroy*, 360 U.S. 474, 492, 79 S. Ct. 1400, 1411 (1959); *Livesay v. Tennessee Bd. of Exam'rs in Watchmaking*, 204 Tenn. 500, 503, 322 S.W.2d 209, 211 (1959); *State v. AAA Aaron's Action Agency Bail Bonds, Inc.*, 993 S.W.2d at 85.

A professional license, issued by a State, which can be suspended or revoked only upon a showing of cause is a constitutionally protectable property interest because the holder of the license has a clear expectation that he or she will be able to continue to hold the license absent proof of culpable conduct. *Barry v. Barchi*, 443 U.S. 55, 64 & n.11, 99 S. Ct. 2642, 2649 & n.11 (1979).

Our courts have already recognized that the practice of medicine, dentistry, and chiropractic, as well as working as a licensed pest control operator, are protectable interests in property. *Estrin v. Moss*, 221 Tenn. 657, 674, 430 S.W.2d 345, 352 (1968) (pest control operators); *Prosterman v. Board of Dental Exam'rs*, 168 Tenn. 16, 22, 73 S.W.2d 687, 690 (1934) (practice of dentistry); *State Bd. of Med. Exam'rs v. Friedman*, 150 Tenn. 152, 166, 263 S.W. 75, 79 (1924) (practice of medicine); *Janeway v. State Bd. of Chiropractic Exam'rs*, 33 Tenn. App. 280, 286, 231 S.W.2d 584, 587 (1950) (practice of chiropractic).

Architects who meet the statutory requirements receive a certificate valid for two years. Tenn. Code Ann. § 62-2-307(a) (1997). Once they receive a certificate, they may renew their license every two years simply by paying the prescribed fee. Tenn. Code Ann. § 62-2-307(c). Thus, an architect's certificate may be denied, suspended, or revoked only upon proof of one or more grounds contained in Tenn. Code Ann. § 62-2-308(a)(1). Mr. Martin has held and renewed his certificate entitling him to practice architecture since 1969. Accordingly, he had a reasonable expectation that he could continue to hold and renew his certificate to practice architecture absent proof of culpable conduct. Thus, Mr. Martin's interest in continuing to practice in Tennessee as a licensed architect is a property interest entitled to procedural due process protection under the Due Process Clause of the Fourteenth Amendment and Tenn. Const. art. I, § 8.

## C.

The protections of procedural due process apply to administrative proceedings. *Richardson v. Tennessee Bd. of Dentistry*, 913 S.W.2d 446, 455 (Tenn. 1995)*; Medley v. Maryville City Beer Bd.*, 726 S.W.2d 891, 895 (Tenn. 1987) (Fones, J., dissenting). Having determined that Mr. Martin's interest in continuing to practice architecture in Tennessee is entitled to procedural due process protection, we must determine what process is due him. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 2600 (1972); *Armstrong v. Department of Veterans Affairs*, 959 S.W.2d at 597-98. Because due process is a flexible concept, this inquiry is not amenable to one-size-fits-all answers. The extent and nature of the required procedural due process protections depend on the nature and circumstances of the case. *Logan v. Zimmerman Brush Co.*, 455 U.S. at 428, 102 S. Ct. at 1153; *Phillips v. State Bd. of Regents*, 863 S.W.2d 45, 50 (Tenn. 1993)*; State ex rel. McCormick v. Burson*, 894 S.W.2d 739, 743 (Tenn. Ct. App. 1994).

The courts commonly consider three factors when called upon to determine what procedural protections a particular circumstance requires. These factors include: (1) the nature of the private interest affected by the official action, (2) the risk of erroneous deprivation of that interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards, and (3) the government's interests, including the function involved and the fiscal and administrative burdens that any additional or substitute safeguard would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903 (1976); *Wilson v. Wilson*, 984 S.W.2d 898, 902 (Tenn. 1998). In this context, courts have also considered the length and finality of the deprivation, *Logan v. Zimmerman Brush Co.*, 455 U.S. at 434, 102 S. Ct. at 1157, and the availability of later appeals. *Frank's Livestock & Poultry Farm, Inc. v. United States*, 905 F.2d 1515, 1518 (Fed. Cir. 1990).

Procedural due process does not require perfect, error-free governmental decision-making. *Mackey v. Montrym*, 443 U.S. 1, 13, 99 S. Ct. 2612, 2618 (1979); *Eye Clinic, P.C. v. Jackson-Madison County Gen. Hosp.*, 986 S.W.2d at 578. It does, however, require affording persons like

Mr. Martin a relatively level playing field in a contested case hearing. The state should not be permitted to maintain such an unfair strategic advantage that a pall is cast over the fairness of the proceeding. *In re Detention of Kortte*, 738 N.E.2d 983, 986 (Ill. App. Ct. 2000). Thus, due process demands a fair trial before a neutral or unbiased decision-maker. *Bracey v. Gramley*, 520 U.S. 899, 904-05, 117 S. Ct. 1793, 1797 (1997); *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S. Ct. 1456, 1464 (1975); *Ogrodowczyk v. Tennessee Bd. for Licensing Health Care Facilities Comm'n*, 886 S.W.2d 246, 252-53 (Tenn. Ct. App. 1994) (Cantrell, J., concurring); 2 Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.8 (3d ed. 1994) ("*Administrative Law Treatise*"). It also demands an appearance of fairness and the absence of probability of outside influence on the adjudication. *Utica Packing Co. v. Block*, 781 F.2d 71, 77-78 (6th Cir. 1986).

Mr. Martin's procedural due process challenge in this case rests on his belief that the Board and the Department failed to insulate the lawyers who prosecute cases before the Board from those who advise and represent the Board in other matters. The courts and academics have considered the due process implications of various combinations of the investigating, prosecuting, and decision-making functions by administrative agencies. They recognize that we do not live in a perfect world and that reality dictates operating in judicial and administrative systems that potentially contain some amount of unavoidable human predilection. Martin H. Redish & Lawrence C. Marshall, *Adjudicatory Independence and the Values of Procedural Due Process*, 95 Yale L.J. 455, 492 (1986) ("Redish & Marshall"). They also recognize that the variety and complexity of administrative processes being used in this country will not yield to a single organizing principle, *Withrow v. Larkin*, 421 U.S. at 52, 95 S. Ct. at 1467, and that the pristine separation of functions characteristic of the criminal law is not entitled to be enshrined as the exclusive means for resolving disputes. *Howitt v. Superior Court*, 5 Cal. Rptr. 2d 196, 200 (Ct. App. 1992); *Administrative Law Treatise* § 9.9, at 92; 2 Charles H. Koch, *Administrative Law and Practice* § 6.11[1], at 309 (2d ed. 1997) ("*Administrative Law and Practice*"); Michael Asimow, *When the Curtain Falls: Separation of Functions in the Federal Administrative Agencies*, 81 Colum. L. Rev. 749, 768 (1981). Accordingly, there is a clear consensus that some combination or overlapping of functions in an administrative proceeding is not inconsistent with fundamental fairness. *Administrative Law Treatise* § 9.9, at 93.

The United States Supreme Court has provided the constitutional framework for analyzing combination of function issues arising from state and federal administrative proceedings. The decision came in an appeal involving a disciplinary hearing before the Wisconsin Medical Examining Board. The physician asserted that the administrative proceeding was inherently unfair because the board itself had combined the investigative and decision-making functions.[3] The Court implicitly rejected this structural argument and held that the "combination of investigative and adjudicative functions does not, without more, constitute a due process violation." *Withrow v. Larkin*, 421 U.S. at 58, 95 S. Ct. at 1470. However, the Court continued by pointing out that, depending on the facts and circumstances of the case, the risk of error could become sufficiently high to prompt due process concerns. *Withrow v. Larkin*, 421 U.S. at 58, 95 S. Ct. at 1470.

---

[3]The Board had conducted an investigative hearing to inquire into whether the physician had engaged in prohibited acts and then had notified the physician that it was going to convene a contested hearing to determine whether he had committed the prohibited acts and whether his license should be temporarily suspended. *Withrow v. Larkin*, 421 U.S. at 39-41, 95 S. Ct. at 1460-61.

-7-

Following the *Withrow v. Larkin* decision, the prevailing view is that a party basing a procedural due process claim on an impermissible combination of functions argument must demonstrate that the risk of actual bias is intolerably high, not merely that a combination of functions exists. *Administrative Law and Practice* § 6.11[1], at 310. Thus, any form of function combination, occurring alone and without other exacerbating biasing influences, is very unlikely to run afoul of procedural due process. John R. Allison, *Combination of Decision-Making Functions, Ex Parte Communications, and Related Biasing Influences: A Process-Value Analysis*, 1993 Utah L. Rev. 1135, 1167-68.

A combination of prosecutorial and adjudicative functions is the most problematic combination for procedural due process purposes. A prosecutor, by definition, is a partisan advocate for a particular position or point of view. The role is inconsistent with the objectivity expected of administrative decision-makers. Accordingly, to permit an advocate for one party to act as the legal advisor for the decision-maker creates a substantial risk that the advice given to the decision-maker will be skewed. *Howitt v. Superior Court*, 5 Cal. Rptr. at 202. However, the risk of bias becomes intolerably high only when the prosecutor serves as the decision-maker's advisor in the same or a related proceeding. Thus, an administrative agency's staff counsel may permissibly prosecute a case before the agency when an independent hearing officer presides over the contested case hearing and the prosecutor plays no role in the agency's deliberations. *Ogg v. Louisiana State Bd. of Chiropractic Exam'rs*, 602 So. 2d 749, 752-53 (La. Ct. App. 1992). Similarly, two lawyers from the same office could serve as prosecutor and legal advisor to the administrative agency as long as they were effectively screened from each other. *Howitt v. Superior Court*, 5 Cal. Rptr. at 203.

Mr. Watkins and his colleagues did not serve in an impermissible dual capacity in this case. While they prosecuted the charges against Mr. Martin before the Board, they did not advise the Board during the proceeding and played no role in the Board's deliberations. Ever since the filing of the notice of charges, an administrative law judge employed by the Secretary of State has provided these services. The administrative law judge worked independently of the employees of the Division of Regulatory Boards,[4] and there is no evidence of any sort of ex parte communications between the administrative law judge and the lawyers prosecuting Mr. Martin. Accordingly, the existence of a prior, unrelated professional relationship between the Board and the lawyers prosecuting Mr. Martin, by itself, does not undermine the fairness of the proceeding.

## D.

Individual board members are subject to disqualification for bias if their impartiality can reasonably be questioned. *Tennessee Cable Television Ass'n v. Tennessee Pub. Serv. Comm'n*, 844 S.W.2d 151, 164-65 (Tenn. Ct. App. 1992). To amount to grounds for disqualification, a board member's bias must take one of three forms: (1) personal interest bias (i.e., where the board

---

[4]The circumstances of this case differ significantly from those of the case where we held that fundamental fairness did not permit using an administrative law judge who was an employee of the lawyer for one of the parties. *Malone & Hyde, Inc. v. Tennessee Dep't of Revenue*, No. 01A01-9302-CH-00056, 1993 WL 295023, at *2 (Tenn. Ct. App. Aug. 4, 1993) (No Tenn. R. App. P. 11 application filed). There is a natural suspicion that adjudicators will act favorably toward their employers. *V-1 Oil Co. v. Department of Envt'l Quality*, 939 P.2d 1192, 1198 (Utah 1997). This suspicion does not arise in this case because no employment or supervisory relation exists between the administrative law judge and the lawyers employed by the Division of Regulatory Boards.

members will either gain or lose fairly directly from the decision), (2) bias or prejudice against a party either as an individual or as a member of a group, and (3) bias stemming from the prejudgment of disputed fact issues that will prevent a board member from fairly and impartially weighing the evidence. *Administrative Law Treatise* § 9.8, at 68; Redish & Marshall, 95 Yale L.J. at 492. Unless the person challenging a board member for bias comes forward with evidence of bias of this sort, the courts will presume that the challenged board member, like other public officials, will perform his or her duty in good faith and in the manner prescribed by law. *Withrow v. Larkin*, 421 U.S. at 47, 95 S. Ct. at 1464; *General Motors Corp. v. Capitol Chevrolet Co.*, 645 S.W.2d 230, 235 (Tenn. 1983).[5]

Mr. Martin neither claimed nor proved that any member of the Board should be disqualified for personal interest bias, personal prejudice against him, or prejudgment of the material facts in the case. Accordingly, to overcome the presumption of honesty and impartiality accorded to members of administrative agencies, it was incumbent upon Mr. Martin to come forward with evidence of specific acts, either by the Board members themselves or by members of their staff, that would cause a reasonable person to question the Board's impartiality. Merely pointing out that the prosecuting lawyer provided the Board with legal advice and services regarding unrelated matters does not suffice. Mr. Martin has neither claimed nor proved that any Board member has initiated or received ex parte communications about the charges against Mr. Martin or has engaged in any sort of similar conduct that would undermine the fairness of the proceeding. Therefore, we conclude that Mr. Martin has failed to rebut this presumption that the members of the Board performed their duties in good faith and in accordance with the law. Having failed to rebut this presumption, Mr. Martin's procedural due process claim must fail.

## III.
### THE EVIDENTIARY SUPPORT FOR MR. MARTIN'S SUSPENSION

The State raises one issue on this appeal. It asserts that the trial court erred by concluding that the Board's decision to suspend Mr. Martin's certificate of registration lacks adequate evidentiary support. We have concluded that the trial court was correct with regard to all but a portion of one project because the Department, for the most part, failed to introduce expert testimony regarding two essential elements of its case – the standards of professional practice applicable to Mr. Martin's conduct and how Mr. Martin's conduct fell below this standard.

### A.

The growth in the number of administrative boards and agencies has been one of the most significant legal trends in the last century. *FTC v. Ruberoid Co.*, 343 U.S. 470, 487, 72 S. Ct. 800, 810 (1952) (Jackson, J., dissenting). Much of the impetus for this growth has been a desire to develop efficient regulatory mechanisms for activities which, because of their technical nature, are not readily amenable to direct legislative or judicial oversight. Thus, one of the fundamental

---

[5]Even though the Tennessee Supreme Court was citing to the law of Georgia in this case, Tennessee also recognizes a rebuttable presumption that public officials perform their duty in good faith, *Williams v. American Plan Corp.*, 216 Tenn. 435, 441, 392 S.W.2d 920, 923 (1965); *State ex rel. Witcher v. Bilbrey*, 878 S.W.2d 567, 576 (Tenn. Ct. App. 1994), and in the manner prescribed by law. *Reeder v. Holt*, 220 Tenn. 428, 435-36, 418 S.W.2d 249, 252 (1967); *Jackson v. Aldridge*, 6 S.W.3d 501, 503 (Tenn. Ct. App. 1999).

premises upon which administrative law is built is that the quality and efficiency of the regulatory process will be enhanced by entrusting decision-making authority to experienced, expert administrators. *Rolfe v. Psychiatric Sec. Review Bd.*, 633 P.2d 846, 852-53 (Or. Ct. App. 1981).

Using expert decision-makers is not the only key ingredient of administrative proceedings. The minimum requirements of due process must also be satisfied when an agency's decision could adversely affect vested property interests or other constitutional rights. While due process does not dictate particular procedures that must be used in every instance, *Estrin v. Moss*, 221 Tenn. 657, 676, 430 S.W.2d 345, 353 (1968), at a minimum, administrative proceedings must afford affected parties (1) adequate notice, *McClellan v. Board of Regents*, 921 S.W.2d 684, 688 (Tenn. 1996); (2) an opportunity for a hearing at a meaningful time and in a meaningful manner, *Haywood v. State Bd. of Educ.*, 874 S.W.2d 67, 72 (Tenn. Ct. App. 1993); *Mid-South Indoor Horse Racing, Inc. v. Tennessee State Racing Comm'n*, 798 S.W.2d 531, 540 (Tenn. Ct. App. 1990); and (3) an opportunity to obtain judicial review of the board's or agency's decision. *St. Joseph Stock Yard Co. v. United States*, 298 U.S. 38, 84, 56 S. Ct. 720, 740 (1936); *Public Serv. Comm'n v. General Tel. Co.*, 555 S.W.2d 395, 402 (Tenn. 1977); Bernard Schwartz, *Administrative Law Cases During 1996*, 49 Admin. L. Rev. 519, 536-37 (1997).

The Uniform Administrative Procedures Act addresses each of these requirements in the context of contested case proceedings to revoke or suspend professional licenses. Tenn. Code Ann. § 4-5-320(c) (1998) requires written notice prior to commencing an administrative proceeding to revoke or suspend a license. Tenn. Code Ann. §§ 4-5-102(3), -312 (1998) provide for contested case proceedings in which the parties have an opportunity to respond to the charges against them, to present evidence and argument, to conduct cross-examination, and to submit rebuttal evidence. Likewise, Tenn. Code Ann. §§ 4-5-322, -323 (1998) provide for judicial review of decisions in contested cases as of right at both the trial and appellate level.

### B.

The State has the burden of proving one or more of the statutory grounds for revoking or suspending an architect's certificate of registration. *Estrin v. Moss*, 221 Tenn. at 677, 430 S.W.2d at 354 (placing the burden of proof in a disciplinary proceeding on the State). Thus, it is incumbent on the State to establish by substantial and material evidence one or more of the grounds listed in Tenn. Code Ann. § 62-2-308(a)(1). These statutory grounds do not necessarily require the same types of evidence. Some of the grounds may involve conduct and issues easily understood by persons who are not themselves registered architects. However, other grounds may require expert testimony because they involve technical issues beyond the common knowledge, experience, and understanding of persons who are not registered professionals.

For example, Tenn. Code Ann. § 62-2-308(a)(1)(D) permits revoking or suspending an architect's certificate of registration if a court of competent jurisdiction determines that the architect breached a contract for professional services. Disciplinary action under this statute could be triggered simply by introducing court papers concluding that an architect breached his or her contract for professional services. No expert testimony is necessary in this circumstance because persons who are not registered design professionals will be able to decide whether a court of competent jurisdiction has determined that an architect breached his or her contract for professional services.

-10-

Similarly, Tenn. Code Ann. § 62-2-308(a)(1)(F), permits disciplinary action if another state or national registration board has suspended or revoked an architect's right to practice. Charges based on this statute do not require expert testimony because all that is required is competent evidence that another state or national registration board has suspended or revoked an architect's certificate of registration. A decision-maker need not be a registered design professional to be able to understand whether another jurisdiction has taken disciplinary action against an architect.

On the other hand, several statutory grounds for disciplining an architect require knowledge not normally possessed by persons who are not design professionals themselves. These grounds, as a general matter, require knowledge and understanding of the applicable standards of professional conduct. For example, Tenn. Code Ann. § 62-2-308(a)(1)(B)[6] permits the revocation or suspension of a certificate of registration for "gross negligence, incompetency, or misconduct in the practice of architecture." This ground, as a general matter, requires knowledge and understanding of the applicable standards of professional conduct for architects and an ability to determine whether particular conduct falls below these standards.

Similarly, Tenn. Code Ann. § 62-2-308(a)(1)(E) permits disciplinary action against an architect or engineer for violating the Board's rules of professional conduct.[7] Tenn. Comp. R. & Regs. r. 0120-2-.02(1) & (2)[8] require architects to protect the health, safety, and welfare of the public by reporting a client's or a contractor's decision to violate applicable federal, state, or local building laws or regulations. Determining whether the actions of a client or contractor are inconsistent with building laws and regulations requires specialized knowledge not ordinarily possessed by lay persons. Accordingly, expert testimony is necessary to establish a violation of Tenn. Comp. R. & Regs. r. 0120-2-.02(1) & (2).

The same can be said for Tenn. Comp. R. & Regs. r. 0120-2-.03 that requires architects to limit their practices to areas in which they are "competent."[9] An architect acts outside his or her areas of competence if he or she commits "malpractice" which is defined as "reckless, or excessive errors, omissions or building failures in the registrant's record of professional practice." Tenn. Comp. R. & Regs. r. 0120-2-.03(6)(a). Determining whether an architect has acted "incompetently" or has committed "malpractice" or has made "excessive errors" requires expert knowledge of the practice of architecture not normally possessed by persons who are not registered design professionals themselves. Thus, establishing a violation of Tenn. Comp. R. & Regs. r. 0120-2-.03 requires expert testimony.

## C.

When administrative proceedings involve issues requiring professional knowledge and expertise, the question becomes who may provide this expertise. Some administrative boards and

---

[6]This statute provides one of the grounds for the Board's disciplinary action against Mr. Martin.

[7]The Board's rules of professional conduct can be found at Tenn. Comp. R. & Regs. r. 0120-2-.01, through -.09 (1999).

[8]This rule provides one of the grounds for the Board's disciplinary action against Mr. Martin.

[9]This rule provides one of the grounds for the Board's disciplinary action against Mr. Martin.

agencies have been quick to respond that the board members themselves may supply this expertise because, after all, they were appointed to the board or agency because of their expertise and standing in their chosen profession. *See* Charles A. Reich, *The Law of the Planned Society*, 75 Yale L.J. 1227, 1242 (1966). Most courts, including this court, have adopted another view.

The expertise of members of boards and commissions undoubtedly plays a central role in administrative proceedings. Courts customarily defer to adjudicatory determinations made by administrative agencies acting within their area of specialized knowledge, experience, and expertise. *Southern Ry. v. State Bd. of Equalization*, 682 S.W.2d 196, 199 (Tenn. 1984); *Willamette Indus., Inc. v. Tennessee Assessment Appeals Comm'n*, 11 S.W.3d 142, 147 (Tenn. Ct. App. 1999); *Wayne County v. Tennessee Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 279 (Tenn. Ct. App. 1988). Accordingly, the courts do not substitute their own judgment for that of a board or agency with regard to the weight of the evidence. *Sanifill of Tenn., Inc. v. Tennessee Solid Waste Disposal Control Bd.*, 907 S.W.2d 807, 810 (Tenn. 1995); *Sanford v. Tennessee Dep't of Env't & Conservation*, 992 S.W.2d 410, 413-14 (Tenn. Ct. App. 1998); *Ware v. Green*, 984 S.W.2d 610, 614 (Tenn. Ct. App. 1998).

It is one thing for a board or agency to use its expertise and experience to understand and evaluate the complexities of the technical evidence presented by the parties. It is, however, quite another thing for the members of the board or agency to rely on their own expertise as a substitute for expert testimony not presented during the contested case hearing. Permitting board members to fill this evidentiary void created by the absence of key expert testimony seriously compromises the fairness of administrative proceedings in four fundamental ways.

First, persons facing the loss or suspension of their professional license in a contested case proceeding have the right to confront, cross-examine, and rebut the evidence against them. Tenn. Code Ann. § 4-5-312(b). They have these rights even when the board or agency takes official notice of technical or scientific matters. Tenn. Code Ann. § 4-5-313(6). When no other expert testimony has been presented, permitting individual board members to rely on their own expertise dilutes the effectiveness of these rights because board members cannot be cross-examined and because board members' opinions may not be known. *Thebaut v. Georgia Bd. of Dentistry*, 509 S.E.2d 125, 132 (Ga. Ct. App. 1998); *In re Schramm*, 414 N.W.2d 31, 35 (S.D. 1987); Bernard Schwartz, *Administrative Law* § 7.13, at 399 (3d ed. 1991).

Second, an administrative agency's fact-finding must be limited to evidence properly included in the administrative record. The record serves as the "exclusive basis for agency actions in adjudicative proceedings." Tenn. Code Ann. § 4-5-319(d). When the administrative record contains no other expert testimony, allowing the board members to base their decision on personal knowledge and opinions, especially when they are not reflected in the record, is contrary to this "exclusiveness" principle. As Professor Schwartz has noted, "[w]ithout the exclusiveness principle, the right to be heard is a right only to present one side of the case. The hearing itself becomes only an administrative town meeting rather than the adversary proceeding required by due process." Bernard Schwartz, *Administrative Law* § 7.13, at 397; *see also Rolfe v. Psychiatric Sec. Review Bd.*, 633 P. 2d at 853.

Third, many administrative boards and agencies are no longer comprised solely of persons with expertise in the regulated field or profession. Many administrative bodies are now required to have one or more lay members who, by definition, have no expertise in the field or profession regulated by the board. In addition, other boards and agencies regulate broad areas of professional activity making it difficult, if not unlikely, that all board members will possess expertise in each of the professions or activities within the board's jurisdiction. In these circumstances, expert testimony regarding the standard of care and the breach of the standard of care are necessary in order to enable the board members lacking expertise in the profession at issue to perform their adjudicatory responsibilities. *Thebaut v. Georgia Bd. of Dentistry*, 509 S.E.2d at 132; *In re Schramm*, 414 N.W.2d at 36.

The composition of the Board of Examiners for Architects and Engineers demonstrates the necessity of expert testimony. Of the Board's nine members, one must be a lay person who is not licensed in any of the professions regulated by the Board,[10] three must be registered architects, three must be registered engineers, one must be a registered landscape architect, and one must be a registered interior designer.[11] Accordingly, it is quite possible that, in a disciplinary proceeding involving an architect, a majority of the Board will lack sufficient expertise to have a personal understanding of the applicable standards of professional practice for a particular professional. In this circumstance, expert testimony regarding the applicable standards of professional conduct is necessary to enable the board members who are unfamiliar with the applicable standard of practice to discharge their adjudicatory responsibilities. Without this evidence, the non-expert board members will be faced with the choice of either basing their decision on their own uninformed notions about the applicable professional standards or deferring to board members who possess the necessary expertise. Either choice runs counter to the premise that regulatory boards can fairly and efficiently regulate professional endeavors.

Finally, permitting board members to substitute their own expert opinions for necessary expert testimony undermines the ability of reviewing courts to determine whether the agency's decision is based on substantial and material evidence. Tenn. Code Ann. § 4-5-322(g) confines reviewing courts to the contents of the administrative record. Determining whether an agency's decision is supported by substantial and material evidence is difficult enough when the subject matter of the hearing is not in an area of one's own education and experience. The task becomes impossible when only one pan of the evidentiary scales is filled. *Chase v. Department of Prof'l Regulation*, 609 N.E.2d 769, 774 (Ill. App. Ct. 1993). Reviewing courts are not mind readers. When the record contains little or no evidence regarding the applicable professional standards, the courts cannot, by telepathy, determine the factual basis for the board's decision. *Thebaut v. Georgia Bd. of Dentistry*, 509 S.E.2d at 132; *Smith v. Department of Registration & Educ.*, 106 N.E.2d 722, 730-31 (Ill. 1952). Disciplinary actions based on a registrant's deviation from professional practice standards require expert testimony of these standards, as well as the deviations from these standards. Without evidence of this sort, judicial review would be "lost in a haze of so-called expertise," and "[a]dministrative expertise would then be on its way to becoming 'a monster which rules with no practical limitations on its discretion.'" *Baltimore & Ohio R. Co. v. Aberdeen & Rockfish R. Co.*, 393 U.S. 87, 92, 89 S. Ct. 280, 283 (1968) (*quoting Burlington Truck Lines v. United States*, 371 U.S.

---

[10]Tenn. Code Ann. § 62-2-201(b).

[11]Tenn. Code Ann. § 62-2-201(a)(2).

156, 167, 83 S. Ct. 239, 245 (1962)); *see also Thebaut v. Georgia Bd. of Dentistry*, 509 S.E.2d at 132; *Chase v. Department of Prof'l Regulation*, 609 N.E.2d at 774; *In re Schramm*, 414 N.W.2d at 36-37.

We take this occasion to hold again that when a professional's license is at stake, competent expert testimony must be introduced if the issues in the administrative proceeding require establishing the applicable standards of professional conduct and determining whether particular conduct fell below these standards. *Williams v. Tennessee Bd. of Med. Exam'rs*, No. 92-3372-I, 1994 WL 420910, at *8 (Tenn. Ct. App. Aug. 12, 1994) (No Tenn. R. App. P. 11 application filed). Requiring the introduction of expert testimony in cases of this sort protects the fairness of the contested case proceedings, the integrity of the administrative record, and the right to meaningful judicial review of administrative decisions. If expert testimony is not presented, the individual board members cannot fill the void by silently falling back on their own unexpressed and uncross-examined experience and expertise. By imposing the requirement of expert testimony regarding standards of conduct and the breach of these standards, we align ourselves with the majority of courts in other jurisdictions that have addressed this question.[12]

## D.

Requiring expert testimony to establish the applicable standards of professional conduct and the breach of these standards does not end the inquiry. Two issues remain. We have yet to determine whether there are exceptions to the rule requiring expert opinions regarding the issue of professional negligence. We must also address the general principles governing the qualification of expert witnesses. The general rules used in professional malpractice cases provide an appropriate framework for addressing these issues.

---

[12]*Hake v. Arkansas State Med. Bd.*, 374 S.W.2d 173, 175-76 (Ark. 1964); *Franz v. Board of Med. Quality Assurance*, 642 P.2d 792, 798-99 (Cal. 1982); *McKay v. State Bd. of Med. Exam'rs*, 86 P.2d 232, 236 (Colo. 1938); *Thebout v. Georgia Bd. of Dentistry*, 509 S.E.2d at 132-33; *Woodfield v. Board of Prof'l Discipline*, 905 P.2d 1047, 1057 (Idaho Ct. App. 1995); *Chase v. Department of Prof'l Regulation*, 609 N.E.2d at 774-75; *Medical Licensing Bd. v. Ward*, 449 N.E.2d 1129, 1141-42 (Ind. Ct. App. 1983); *Board of Dental Exam'rs v. Brown*, 448 A.2d 881, 884-85 (Me. 1982); *Cobble v. Commissioner of Dep't of Social Servs.*, 719 N.E.2d 500, 508 (Mass. 1999); *New Jersey State Bd. of Optometrists v. Nemitz*, 90 A.2d 740, 745-46 (N.J. Super. Ct. App. Div. 1952); *In re Williams*, 573 N.E.2d 638, 640 (Ohio 1991); *C. F. Braun & Co. v. Corporation Comm'n*, 609 P.2d 1268, 1272-73 (Okla. 1980); *Drew v. Psychiatric Sec. Rev. Bd.*, 909 P.2d 1211, 1214 (Or. 1996); *In re Schramm*, 414 N.W.2d at 35-37; *Dotson v. Texas State Bd. of Med. Exam'rs*, 612 S.W.2d 921, 923-24 (Tex. 1981); *Gilbert v. State of Wisconsin, Med. Examining Bd.*, 349 N.W.2d 68, 81-84 (Wis. 1984); *see also In re Comm'n's Investigation of Rates for Gas Serv. of PNM's Gas Servs.*, 998 P.2d 1198, 1202 (N.M. 2000); *Railroad Comm'n v. Lone Star Gas Co.*, 618 S.W.2d 121, 124-25 (Tex. Civ. App. 1981); *but see Ferguson v. Hamrick*, 388 So. 2d 981, 983 (Ala. 1980); *Croft v. Arizona State Bd. of Dental Exam'rs*, 755 P.2d 1191, 1197 (Ariz. Ct. App. 1988); *Levinson v. Connecticut Bd. of Chiropractic Exam'rs*, 560 A.2d 403, 411-15 (Conn. 1989); *Hebert v. Louisiana Racing Comm'n*, 476 So. 2d 823, 825 (La. Ct. App. 1985); *Sillery v. Board of Med.*, 378 N.W.2d 570, 573 (Mich. Ct. App. 1985); *State Bd. of Chiropractic Exam'rs v. Clark*, 713 S.W.2d 621, 628-29 (Mo. Ct. App. 1986); *In re Beyer*, 453 A.2d 834, 837 (N.H. 1982); *Lahey v. North Carolina Bd. of Nursing*, 488 S.E.2d 245, 248 (N.C. 1997); *Kundrat v. Commonwealth*, 447 A.2d 355, 358 (Pa. Commw. Ct. 1982); *Davidson v. State*, 657 P.2d 810, 812 (Wash. Ct. App. 1983).

**1.**
**The Common Knowledge Exception**

Tennessee's courts have held repeatedly that determining whether a professional's conduct complies with the applicable standard of care is beyond the common knowledge of lay persons. *Moon v. Saint Thomas Hosp.*, 983 S.W.2d 225, 229 (Tenn. 1998) (medical malpractice); *Lazy Seven Coal Sales, Inc. v. Stone & Hinds, P.C.*, 813 S.W.2d 400, 406 (Tenn. 1991) (legal malpractice). Thus, expert testimony is required to establish not only the applicable standard of care but also whether the conduct at issue fell below that standard. Expert testimony cannot be dispensed with unless the professional's lack of skill or care is so apparent as to be in the comprehension of a lay person and requires only common knowledge and experience to understand it. *Seavers v. Methodist Med. Ctr.*, 9 S.W.3d 86, 92 (Tenn. 1999) (medical malpractice); *Cleckner v. Dale*, 719 S.W.2d 535, 540 (Tenn. Ct. App. 1986) (legal malpractice).

The "common knowledge exception" developed in professional liability cases is equally applicable to administrative disciplinary proceedings such as this one. Thus, expert testimony regarding the applicable standard of care and the breach thereof may be dispensed with when the acts of professional negligence are so obvious that they come within the common knowledge of lay persons. *Murphy v. Schwartz*, 739 S.W.2d 777, 778 (Tenn. Ct. App. 1986) (holding that the negligence must be so obvious that "all mankind knows that such things are not done absent negligence"); *Ayers v. Rutherford Hosp., Inc.*, 689 S.W.2d 155, 160 (Tenn. Ct. App. 1984). As one court has put it, the professional negligence must be "as plain as a fly floating in a bowl of buttermilk" to trigger the common knowledge exception. *German v. Nichopoulos*, 577 S.W.2d 197, 202-03 (Tenn. Ct. App. 1978). Thus, the common knowledge exception does not apply when understanding the alleged professional negligence requires scientific or technical analysis or discussion. *Seavers v. Methodist Med. Ctr.*, 9 S.W.3d at 92.

**2.**
**Qualifications of Expert Witnesses**

The Tennessee Rules of Evidence provide the general rules governing the qualification of experts called to testify in administrative disciplinary hearings such as this one.[13] In this regard, Tenn. R. Evid. 702 provides that evidence involving scientific, technical, or other specialized knowledge may be presented by "a witness qualified as an expert by knowledge, skill, experience, training, or education." To qualify as an expert under Tenn. R. Evid. 702, a witness should have a "thorough knowledge of the subject matter of his or her testimony," *Otis v. Cambridge Mut. Fire Ins.*

---

[13]Contested case proceedings are not governed exclusively by the Tennessee Rules of Evidence. Tenn. R. Evid. 101 adv. comm'n cmt. However, the rules of evidence must be followed except when it is necessary for the agency to "ascertain facts not reasonably susceptible to proof under the rules of court." In this circumstance, evidence not otherwise admissible under the Tennessee Rules of Evidence may be admitted in an administrative proceeding "if it is of a type commonly relied upon by reasonable prudent men [or women] in the conduct of their affairs." Tenn. Code Ann. § 4-5-313(1) (1998); *Rayder v. Grunow*, No. 91-3570-I, 1993 WL 95561, at *2-3 (Tenn. Ct. App. Apr. 2, 1993) (No Tenn. R. App. P. 11 application filed); *Rivers v. Tennessee Bd. of Dentistry*, No. 01A01-9111-CH-00409, 1992 WL 146709, at *6 (Tenn. Ct. App. June 30, 1992), *perm. app. denied* (Tenn. Oct. 19, 1992). By definition, expert testimony regarding the standards of professional conduct involves matters that are beyond the common understanding of lay persons and are quite easily susceptible to proof under the rules of court.

*Co.*, 850 S.W.2d 439, 443 (Tenn. 1992), and some special as well as practical acquaintance with the immediate line of inquiry. *Powers v. McKenzie*, 90 Tenn. 167, 181, 16 S.W. 559, 562 (1891).

In addition to the general qualification for expert witnesses in Tenn. R. Evid. 702, additional specific qualifications to give expert testimony may be imposed by statute or the common law. For example, witnesses called to give expert testimony in medical malpractice cases must satisfy the "locality rule" in Tenn. Code Ann. § 29-26-115(b) (2000).[14] These specific qualifications apply only to the professions specifically covered by the statute or the common-law rule. *Underwood v. Waterslides of Mid-America, Inc.*, 823 S.W.2d at 183 (holding that the requirement in Tenn. Code Ann. § 29-26-115(b) that an expert be familiar with the local standard of care does not apply to engineers and contractors).

**3.**
**Possession of an Architectural Degree or Certificate as a Necessary Qualification**

The practice of architecture, as we have already noted, is sufficiently technical to require expert testimony to establish the applicable standard of professional practice and any departure therefrom.[15] As with other professions, this general rule is subject to the common knowledge exception.[16] Ordinarily, evidence regarding professional standards takes the form of testimony by witnesses who are in the same profession or trade. However, nothing in Tenn. R. Evid. 702 precludes the introduction and consideration of expert testimony by a witness whose profession differs from the one at issue, as long as the witness can testify authoritatively regarding the

---

[14]Tenn. Code Ann. § 29-26-115(b) provides, in part, that

No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous border state a profession or specialty which would make the person's expert testimony relevant to the issues in the case . . .."

Another panel of this court has stated in dicta that the same locality rule that applies to physicians also applies to lawyers giving expert opinions in legal malpractice cases. *Underwood v. Waterslides of Mid-America, Inc.*, 823 S.W.2d 171, 182-83 (Tenn. Ct. App. 1991). However, while the cases relied upon by the court require the expert to have knowledge of the standard of professional care in the jurisdiction where the defendant practices law, *Spalding v. Davis*, 674 S.W.2d 710, 714 (Tenn. 1984), *overruled on other grounds*, *Meadows v. State*, 849 S.W.2d 748, 752 (Tenn. 1993); *Cleckner v. Dale*, 719 S.W.2d at 540, they do not condition the witness's ability to testify as an expert on being licensed in the same state or a contiguous state for at least one year by the time the alleged legal malpractice occurred.

[15]*Bartak v. Bell-Galyardt & Wells, Inc.*, 629 F.2d 523, 530 (8th Cir. 1980); *McKee v. City of Pleasanton*, 750 P.2d 1007, 1011 (Kan. 1988); *Pritchard Bros., Inc. v. Grady Co.*, 436 N.W.2d 460, 465 (Minn. Ct. App. 1989); *Overland Constructors v. Millard Sch. Dist.*, 369 N.W.2d 69, 75-76 (Neb. 1985); *Wedlock v. Troncoso*, 712 N.Y.S.2d 328, 332 (Sup. Ct. 2000); *Dempsey v. International Ass'n of Bridge, Structural & Ornamental Ironworkers*, No.03A01-9709-CV-00436, 1998 WL 25407 at *9 (Tenn. Ct. App. May 19, 1998), *perm. app. denied* (Tenn. Nov. 2, 1998); *Nelson v. Virginia*, 368 S.E.2d 239, 243-44 (Va. 1988); *Garaman v. Williams*, 912 P.2d 1121, 1123 (Wyo. 1996).

[16]*H. Elton Thompson & Assocs., P.C. v. Williams*, 298 S.E.2d 539, 540 (Ga. Ct. App. 1982); *M.J. Womack, Inc. v. House of Representatives*, 509 So. 2d 62, 65-66 (La. Ct. App. 1987).

applicable standard of care and can explain how the conduct at issue breaches this standard.[17]  In circumstances where various professions are competent to work in a particular field, the competence of experts should be judged by whether they meet the minimum standards for that particular field.

A majority of jurisdictions that have considered the question have held that an expert witness's competence should not be judged solely on the particular degree or professional license he or she holds. *Yantzi v. Norton*, 927 S.W.2d 427, 431 (Mo. Ct. App. 1996); *Southland Lloyd's Ins. Co. v. Tomberlain*, 919 S.W.2d 822, 827 (Tex. App. 1996).[18]  Accordingly, as long as the activity at issue is not unique to architects, *National Cash Register Co. v. Haak*, 335 A.2d 407, 411 (Pa. Super. Ct. 1975), the courts have permitted witnesses without an architectural degree or license to give expert testimony regarding the standard of professional practice to which the architect should be held.  *Perlmutter v. Flickinger*, 520 P.2d 596, 597-98 (Colo. Ct. App. 1974) (permitting a chemical engineer who designed skylights and a contractor who installed skylights to testify regarding an architect's standard of care for designing the skylights); *Pritchard Bros., Inc. v. Grady Co.*, 436 N.W.2d at 466 (permitting a professional estimator and certified engineering technician to testify regarding the standard of care applicable to architects who review shop drawings, *Brushton-Moira Cent. Sch. Dist. v. Alliance Wall Corp.*, 600 N.Y.S.2d 511, 512 (App. Div. 1993) (permitting a civil engineer specializing in the design and evaluation of wall systems to give an expert opinion concerning the standard of care applicable to architects designing walls); *National Cash Register Co. v. Hoak*, 335 A.2d at 411 (permitting a geologist and an engineer specializing in hydraulics to give expert testimony regarding an architect's design of a surface water distribution system); *Wessel v. Erickson Landscaping Co.*, 711 P.2d 250, 254 (Utah 1985) (permitting a structural engineer with experience in designing retaining walls to give expert testimony regarding an architect's standard of care for designing retaining walls).  Decisions exlcuding the testimony of experts who are not architects generally hinge not on whether the witness possesses the correct degree or professional license, but rather on the expert's lack of relevant experience or training, *Walker v. Bluffs Apartments*, 477 S.E.2d 472, 473 (S.C. Ct. App. 1996), or on the witness's lack of familiarity with the applicable standards of professional conduct.  *H. Elton Thompson & Assocs., Inc. v. Williams*, 298 S.E.2d at 540.

We have concluded that a person need not possess either a degree in architecture or an architect's certificate to be qualified to testify as an expert regarding the standard of care of architects and whether particular conduct violates that standard.  The witness's qualifications should be evaluated in accordance with Tenn. R. Evid. 702.  Accordingly, witnesses should be permitted to

---

[17]We are aware of the opinion of this court predating the promulgation of the Tennessee Rules of Evidence holding that physicians should not be permitted to offer expert testimony regarding a nurse's standard of care and that office nurses should not be permitted to offer expert testimony regarding a physician's standard of care.  *Crowe v. Provost*, 52 Tenn. App. 397, 413, 374 S.W.2d 645, 652 (1963).  More recently, we sidestepped this issue when we held that a physician's testimony regarding a nurse's standard of care was cumulative and, even if error, harmless. *Evans v. Cocke County Baptist Hosp.*, No. 60, 1987 WL 17976, at *2 (Tenn. Ct. App. Oct. 7, 1987), *perm. app. denied* (Tenn. Dec. 21, 1987).  The Tennessee Rules of Evidence appear to have undermined the continuing precedential value of the *Crowe v. Provost* case; however, we do not have that question squarely before us here.  The most appropriate inquiry should be whether the witness is sufficiently familiar with the applicable standard of care to make his or her expert opinion relevant to the issue in question.  *Cardwell v. Bechtol*, 724 S.W.2d 739, 754 (Tenn. 1987); *Searle v. Bryant*, 713 S.W.2d 62, 65 (Tenn. 1986).

[18]*But see Brennan v. St. Louis Zoological Park*, 882 S.W.2d 271, 273 (Mo. Ct. App. 1994); *Prellwitz v. Cromwell, Truemper, Levy, Parker, and Woodsmale, Inc.*, 802 S.W.2d 316, 318 (Tex. App. 1990).

give expert opinions regarding an architect's conduct if they possess scientific, technical, or other specialized knowledge derived from their knowledge, skill, experience, training, or education that will substantially assist the trier of fact to understand the evidence or to determine a fact in issue.

**E.**

We will now employ these principles to evaluate the evidence regarding Mr. Martin's conduct in connection with the four projects at issue. In order to sustain the Board's decision, we must find that the record contains substantial and material evidence supporting the Board's decision. Like the trial court, we have determined that the administrative record, while voluminous, does not contain substantial and material evidence supporting the Board's conclusions that Mr. Martin's conduct in all of the four projects at issue fell below the applicable standard of care for architects and that his plans for these projects contained excessive errors.

**1.**
**Standard of Review**

Judicial review of decisions by administrative agencies following contested case hearings is governed by the Tennessee Uniform Administrative Procedures Act. Tenn. Code Ann. § 4-5-322(a)(1). Trial and appellate courts use the same standard of review. *Gluck v. Civil Serv. Comm'n*, 15 S.W.3d 486, 490 (Tenn. Ct. App. 1999); *Ware v. Greene*, 984 S.W.2d at 614. When the factual support for an administrative decision is challenged, the courts must examine the entire record to determine whether the decision is supported by substantial and material evidence. Tenn. Code Ann. § 4-5-322(h)(5).

The substantial and material evidence standard requires a searching and careful inquiry into the record to determine the basis for the administrative decision. *Sanifill of Tennessee, Inc. v. Tennessee Solid Waste Disposal Control Bd.*, 907 S.W.2d at 810*; Willamette Indus., Inc. v. Tennessee Assessment Appeals Comm'n*, 11 S.W.3d at 147. In these cases, the courts do not reweigh the evidence or substitute their judgment for that of the administrative agency. *McClellan v. Board of Regents*, 921 S.W.2d at 693; *Humana of Tennessee v. Tennessee Health Facilities Comm'n*, 551 S.W.2d 664, 667 (Tenn. 1977); *Jackson Mobilphone Co., Inc. v. Tennessee Pub. Serv. Comm'n*, 876 S.W.2d 106, 111 (Tenn. Ct. App. 1993). Instead they review the record for such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration. *Clay County Manor, Inc. v. State*, 849 S.W.2d 755, 759 (Tenn. 1993); *Southern Ry. Co. v. State Bd. of Equalization*, 682 S.W.2d at 199*; Papachristou v. University of Tennessee*, 29 S.W.3d 487, 490 (Tenn. Ct. App. 2000).

We may not reverse an administrative decision supported by substantial and material evidence solely because the evidence could also support another result. *Hughes v. Board of Comm'rs*, 204 Tenn. 298, 305, 319 S.W.2d 481, 484 (1958); *Metropolitan Gov't v. Tennessee Solid Waste Disposal Control Bd.*, 832 S.W.2d 559, 561 (Tenn. Ct. App. 1991). Courts may reject an administrative agency's factual findings only if a reasonable person would necessarily draw a different conclusion from the record. *Jones v. Greene*, 946 S.W.2d 817, 828 (Tenn. Ct. App. 1996).

**2.**
**The Timbers Lodge and Old Village Shops Project**

The first project at issue involved a three-story motel and commercial building in Pigeon Forge containing thirty-one rooms and approximately 4,500 square feet of office space. Mr. Martin completed the architectural, structural, mechanical, plumbing, and electrical drawings for the project in March 1987. On April 20, 1987, the structure collapsed while workers were installing pre-cast concrete floors and walls on the steel framework. Among the issues in the ensuing litigation was whether the collapse was caused by shortcomings in Mr. Martin's plans or by the negligence of the erector of the pre-cast concrete members. During this lawsuit, one of Mr. Martin's competitors who had been retained as an expert witness by the owner demanded that the Board discipline Mr. Martin because of his performance on this project.

With regard to this project, the State alleged (1) that Mr. Martin was not competent to prepare the structural, mechanical, plumbing, and electrical drawings; (2) that the drawings contained design deficiencies and violations of applicable safety codes; and (3) that the structural drawings "contributed to the collapse of the project structure on April 20, 1987." To prove these allegations, the State called James Coykendall, the architect who had initially complained about Mr. Martin's plans. While Mr. Coykendall asserted that there were ten serious deficiencies in Mr. Martin's work on this project, his most serious claims were: (1) that Mr. Martin had breached the applicable standard of care by failing to specify in the structural plans the method of attaching the pre-cast concrete to the structural steel beams and by permitting the steel fabricator to design these connections; (2) that Mr. Martin failed to specify fire protection ratings on the plans; (3) that the plans did not include the exit lights, emergency lights, and fire alarms required by the safety codes; and (4) that Mr. Martin should not have undertaken to design a project of that size himself. He also asserted that the "quality" of Mr. Martin's drawings was not "acceptable."

On cross-examination, Mr. Coykendall conceded that he was unaware when he criticized Mr. Martin's plans for being inconsistent with the local building codes that Mr. Martin had obtained a variance with regard to four of the issues he had raised. He also undermined his own conclusions about the adequacy of Mr. Martin's structural drawings when he conceded that he lacked expertise in this area. Considering Mr. Coykendall's testimony in its entirety, his only material points worthy of consideration by the Board are that Mr. Martin's plans for this project were deficient because (1) the fire protection ratings were not specified or detailed, (2) they did not include exit lights or emergency lighting, and (3) they did not provide for fire alarms.

In addition to his own testimony, Mr. Martin presented two experts to respond to Mr. Coykendall's criticisms of his work. Robert L. Whitaker, a structural engineer, testified that Mr. Martin's structural drawings met the requisite standard of care applicable for the design of buildings using pre-cast products.[19] In addition, Robert D. Holsaple, a retired architect and former Board chairman, testified that all of Mr. Martin's drawings complied with the requisite standard of care. He also stated that the structural and electrical aspects of this project were "simple" and that Mr. Martin was not acting beyond his area of competence by preparing the structural, electrical, and other drawings for this project.

---

[19]Mr. Whitaker also opined that Mr. Martin's drawings were not the cause of the collapse of the structure. The issue of causation, however, has little relevance in this case.

Most of Mr. Coykendall's opinions were substantially undermined by his concessions during cross-examination. However, he testified that Mr. Martin's plans fell below the standard of care because they did not include fire alarms, exit lighting, and emergency lights. Mr. Martin concedes, as he must, that his drawings do not include these items. His only explanation for their absence is that the plans were "preliminary" and that he was in a rush to get the plans done quickly because the owner was in a hurry to complete the project. Accordingly, the Board had before it the conflicting testimony of Mr. Coykendall and Mr. Holsaple on the issue of whether Mr. Martin's plans for this project fell below the applicable standard of care. It is not the judiciary's prerogative to weigh this conflicting evidence. Rather, it is the Board's. Based on the record before us, we cannot conclude that reasonable persons can draw only one conclusion from the evidence. Accordingly, we conclude that the record contains substantial and material evidence to support the Board's conclusion that Mr. Martin's omission of fire alarms, exit lights, and emergency lighting from the plans for this project fell below an architect's standard of care for projects of this sort.

### 3.
### The Family Inns of America Project in Gatlinburg

The second project at issue involved a seven-story Family Inns of America in Gatlinburg. In early 1988, Mr. Martin prepared the architectural, electrical, mechanical, and preliminary structural and plumbing plans. Because of the height of the building and its proximity to a river, Mr. Martin presented these plans to Larry Henderson, Gatlinburg's local building official, for "pre-review" and comment. Mr. Martin explicitly stated when he submitted the plans that the plumbing design was incomplete, that structural engineering had yet to be performed, and that the structural design would be performed by a structural engineer hired by the contractor.

On April 18, 1988, Mr. Henderson provided Mr. Martin with a review letter containing twenty-nine comments regarding the plans. Many of these comments related to the structural and plumbing aspects of the project. Following the receipt of Mr. Henderson's comments, Mr. Martin made revisions in his plans. In addition, a structural engineer prepared the structural drawings, and another engineer prepared final plumbing drawings.

The State alleged with regard to this project that Mr. Martin was not competent to prepare or supervise the preparation of the preliminary "structural and/or electrical design drawings" for this project and that his plans contained numerous deficiencies and code violations. The State called no witnesses to prove these allegations, choosing instead to rest its case regarding this project on Mr. Henderson's April 18, 1988 letter and Mr. Martin's concession that the preliminary plans were incomplete.

In response, Mr. Martin insisted that he had not departed from the applicable standards of care and that he never held out his initial plans as being complete. He explained that he was simply seeking "pre-review" of the plans by the local building official. Mr. Holsaple also weighed in on Mr. Martin's work on this project. He stated that architects are permitted to specify that a structural engineer employed by the contractor will prepare the structural drawings. He also testified that architects quite frequently present preliminary plans to local building officials for "pre-review." He also stated categorically that the plans Mr. Martin prepared for this project complied with the applicable standards of professional practice.

With regard to this project, the State presented absolutely no evidence regarding the applicable standard of care for architects submitting preliminary plans to a local building official for "pre-review." Mr. Henderson's letter does not demonstrate that he is familiar with the applicable standards of professional practice or that he is even competent to render an expert opinion regarding the adequacy of Mr. Henderson's plans.[20] The only expert testimony regarding these matters came from Mr. Martin himself and Mr. Holsaple, both of whom stated that Mr. Martin was competent to prepare the preliminary plans for this project and that his work was consistent with the applicable standards of professional practice.

In order for evidence to be substantial and material for the purpose of review under Tenn. Code Ann. § 4-5-322(h)(5), it must be something more than a scintilla. *Gluck v. Civil Serv. Comm'n*, 15 S.W.3d at 490; *MobilComm of Tenn., Inc. v. Tennessee Pub. Serv. Comm'n*, 876 S.W.2d 101, 105 (Tenn. Ct. App. 1993). Having reviewed the evidence regarding Mr. Martin's performance on the Family Inns of America project in Gatlinburg, we, like the trial court, find that there exists no substantial and material evidence to support the Board's finding that Mr. Martin was not competent to prepare the drawings he prepared for this project or that the drawings he prepared fell below the applicable standards of professional practice.

**4.**
**The Family Inns of America Project in Townsend**

The next project at issue involved a two-story, 38-room motel in Townsend. After the Gatlinburg Family Inns project was complete, the owner hired Mr. Martin to prepare the plans for another motel in Townsend. Mr. Martin completed the site plans in October 1988, and completed the architectural and engineering plans in March 1989. Because the owner intended to open the motel on July 4, 1989, to take advantage of the summer tourist season, the project's contractor submitted Mr. Martin's plans to the Townsend building official for fast-track review. After several meetings, the city issued a building permit in April 1989, and construction commenced. Mr. Martin's contract did not include construction administration; accordingly, he did not anticipate that he would be involved with the project after the contractor obtained the building permit.

Three weeks after construction commenced and with approximately sixty percent of the construction complete, an inspector employed by the State Fire Marshal happened upon the project. He informed the contractor and Mr. Martin that the project was under the jurisdiction of the State Fire Marshal, and he directed the owner and contractor to shut down the project until his office could review and approve the plans. However, when no formal stop-work order was issued, the owner and the contractor ignored these instructions and continued constructing the motel.

Following the state inspector's appearance on site, the owner directed Mr. Martin to prepare a set of plans for the State Fire Marshal. Mr. Martin prepared a set of plans dated May 1, 1989, and the owner's lawyer forwarded them to the State Fire Marshal in Nashville. The office received these plans on June 8, 1989, along with a request that they be reviewed on a fast-track basis. Kenneth Robichaux, a plans inspector, completed his review of the plans on June 30, 1989, and mailed a plan

---

[20]In light of Mr. Holsaple's testimony regarding the twenty-nine comments in Mr. Henderson's April 18, 1988 letter, there is a substantial question regarding the substantive validity of many of Mr. Henderson's comments regarding Mr. Martin's plans.

corrections list containing fifty-four comments to Mr. Martin. Mr. Martin's receipt of Mr. Robichaux's comments was substantially delayed because the owner's lawyer had given Mr. Robichaux an incorrect address for Mr. Martin. By the time Mr. Martin received Mr. Robichaux's comments, the motel was completed and open for business.

Once Mr. Martin received Mr. Robichaux's comments, he made corrections and additions to the plans and returned them to Mr. Robichaux. Mr. Robichaux received the second set of plans on October 2, 1989 and, on November 4, 1989, mailed a second plan corrections list containing seventeen comments to Mr. Martin. Mr. Martin returned a third set of plans to Mr. Robichaux in February 1991. Mr. Robichaux responded to these plans in March 1991, and Mr. Robichaux and Mr. Martin met to discuss the project on July 15, 1991. Five days later, Mr. Robichaux received additional submittals from Mr. Martin.

The owner eventually replaced Mr. Martin with another architect. In March 1992, Mr. Robichaux received another set of revised plans for the motel. In April 1992, Mr. Robichaux informed both Mr. Martin and his replacement that the revised plans were still not satisfactory. Finally, on January 13, 1993, Mr. Robichaux and other employees of the State Fire Marshal inspected the motel which, by that time, had been open and operating for over three years. The plans for the project remained unapproved at the time of the Board's hearing in this case.

With regard to this project, the State alleged that Mr. Martin was not competent to prepare the electrical drawings and that he had failed to communicate adequately with the State Fire Marshal and the Board to obtain timely approval of the plans. The State called Mr. Robichaux and William Wamsley, the Director of Codes Enforcement with the State Fire Marshal's Office. Mr. Robichaux has an electrical engineering degree but is not licensed as either an architect or an engineer in Tennessee, and he specifically disclaimed any expertise in the field of architecture. He had been working for the State Fire Marshal for approximately one month when he received Mr. Martin's initial plans for this project. In addition to recounting the history of the State Fire Marshal's review of this project, Mr. Robichaux testified that Mr. Martin has not been "responsive" and that he "would expect more out of a design professional than this."

Mr. Wamsley likewise is not trained or licensed as an architect or an engineer. However, he had received training in safety engineering through the National Fire Academy, the National Fire Protection Association, and the Southern Building Code Congress, and he had worked as a private fire protection consultant for a number of years. At the time he testified, he had been employed for twelve years by the State Fire Marshal to review plans. Mr. Wamsley testified that incomplete plans was the most common problem encountered by his office and that "multiple reviews" are often required to resolve these problems. He also testified that he was aware of other instances when plans had been submitted to the local building authority rather than the State Fire Marshal. He stated that it was "sometimes difficult" for architects to know to which governmental agency they should submit plans for review and, therefore, that the State Fire Marshal looks to the local building authorities to inform architects when plans must be submitted to the State Fire Marshal.

In response to the State's proof, Mr. Martin testified that he was competent to perform the electrical design work for this project, that he had been as responsive as he could be to the State Fire Marshal, and that he had no authority to instruct the owner or the architect to stop work when it was first learned that the plans for the motel should have been submitted to the State Fire Marshal for

review. He laid the responsibility for the failure to obtain the State Fire Marshal's timely approval of the plans on (1) the City of Townsend's issuance of a building permit without informing him that the plans must also be approved by the State Fire Marshal and (2) the owner's unilateral decision to continue the construction of the motel even after he was told that the State Fire Marshal's approval was required.

Mr. Martin also called Mr. Holsaple to provide expert testimony regarding his work on this project. Mr. Holsaple stated that while he would have liked to have seen better quality drawings than the ones Mr. Martin produced for this project, he had "seen a lot of professionals that are a lot worse than this." He also stated that the design of this project was "simple" and that Mr. Martin's drawings met the applicable standard of care for architects designing buildings of this sort.

Directing his attention to the review and approval issues, Mr. Holsaple stated that architects should be entitled to rely on the representations of local building officials. He also stated that Mr. Martin's plans did not receive an excessive number of comments. He disagreed with twenty-nine of Mr. Robichaux's original fifty-four comments and with thirteen of the seventeen comments Mr. Robichaux made regarding Mr. Martin's second set of plans. He also stated that the number of comments made by a building official on a set of plans is not indicative of an architect's competence and that he was "[p]ainfully aware" that an architect's plans generally contain some sort of mistake. Based on this evidence, the Board concluded that Mr. Martin was acting outside of his area of competence when he designed the electrical plans for this project and that Mr. Martin had "failed to communicate adequately with the SFMO and the State Board in order to allow the project to be designed sufficiently for completion and SFMO approval."

The State asserts that it presented substantial and material evidence that Mr. Martin was not competent to prepare the electrical plans for this project through Mr. Robichaux's testimony regarding his comments on the plans. Neither Mr. Robichaux nor Mr. Wamsley testified that they were familiar with the standard of care applicable to architects who are designing building of this sort or that Mr. Martin's work on this project breached these standards. In fact, Mr. Robichaux disclaimed to be testifying as an expert in the field of architecture. Accordingly, as far as this record shows, the expert testimony of Messrs. Martin and Holsaple that Mr. Martin's plans were consistent with the applicable standards of care stands unrebutted by competent evidence.

Even if Messrs. Robichaux and Wamsley could not give expert opinions regarding Mr. Martin's performance, they were competent to provide factual information regarding Mr. Martin's dealings with the State Fire Marshal regarding this project. Accordingly, based on the testimony regarding the number of comments on the plans for the project, it could be argued that a lay person should be able to conclude that the number of comments was excessive and that an excessive number of comments is evidence that an architect was not competent to prepare the plans. Architects, however, are generally not expected to produce perfect plans or drawings. *Lukowski v. Vecta Educ. Corp.*, 401 N.E.2d 781, 786 (Ind. Ct. App. 1980); *Colbert v. B.F. Carvin Constr. Co.*, 600 So. 2d 719, 729 (La. Ct. App. 1992); *Klein v. Catalano*, 437 N.E.2d 514, 525 (Mass. 1982); *Waggoner v. W & W Steel Co.*, 657 P.2d 147, 149 (Okla. 1982); *Howard v. Usiak*, 775 A.2d 909, 915-16 (Vt. 2001). Thus, evidence concerning the number of comments in a set of plans or drawings is not, by itself, sufficient to support a conclusion that an architect was not competent to prepare the plans. This is especially true in this case in light of Mr. Holsaple's testimony that architectural plans are

rarely error-free and that many of Mr. Robichaux's comments were unwarranted or erroneous and Mr. Wamsley's testimony that multiple reviews are often required to resolve problems with plans.

The Board also concluded that Mr. Martin acted inappropriately by failing to prevent the owner and contractor from completing the motel before the plans could be approved. This conclusion is based, in large part, on the testimony of Messrs. Robichaux and Wamsley that Mr. Martin was not properly responsive to their requests for information. We have concluded that the State failed to provide sufficient competent evidence to discipline Mr. Martin for (1) not submitting the plans initially to the State Fire Marshal, (2) not forcing the owner and contractor to stop work in May 1989, or (3) not providing adequate responses to the State Fire Marshal's requests for revisions to the plans.

It is undisputed that the contractor presented Mr. Martin's plans to the Townsend building authorities and that these authorities issued a building permit based on these plans without informing either the owner or Mr. Martin that state law required the plans to be submitted to the State Fire Marshal. Mr. Wamsley testified that architects sometimes had difficulty determining which governmental entity should review plans and that his office relied on the local building officials to point owners and architects in the right direction. Mr. Holsaple added that architects may properly rely on the representations of local building officials and, therefore, that Mr. Martin and the owner properly assumed that the plans were in order when the Townsend building official issued a building permit for the project. In light of this testimony, the record lacks substantial and material evidence to support the conclusion that Mr. Martin acted unprofessionally by not initially submitting the plans to the State Fire Marshal.

By the same token, neither Mr. Robichaux nor Mr. Wamsley testified that Mr. Martin was responsible for the owner's decision to continue with the construction of the motel after he had been informed that construction should not proceed further until the State Fire Marshal had reviewed and approved the plans. Mr. Holsaple stated that Mr. Martin did not have this authority because contract administration was not part of his contract and because he had fully performed the contract when he submitted the plans to the contractor in early 1988. In addition, neither the owner nor the contractor needed to be told that the project had run afoul of the State Fire Marshal because they had received this information directly from the inspectors.

Finally, the record lacks substantial and material evidence that the timing and substance of Mr. Martin's responses to the State Fire Marshal were inconsistent with the applicable standards of care. There is no testimony that Mr. Martin was inappropriately late with his responses once he received Mr. Robichaux's comments. Likewise, Mr. Holsaple testified that Mr. Martin's substantive responses to Mr. Robichaux's comments were appropriate and consistent with the type of response that architects should make to similar comments.

We have reviewed the record relating to Mr. Martin's actions with regard to the Family Inns of America in Townsend. Like the trial court, we have concluded that the record does not contain substantial and material evidence to support the Board's conclusions that Mr. Martin was not competent to prepare the electrical plans for the motel and that Mr. Martin's conduct and communications with the State Fire Marshal were inconsistent with Tenn. Comp. R. & Regs. r. 0120-2-.02(2).

**5.**
**The East Tennessee Motor Company Body Shop Project**

The fourth and final project at issue in this case involves the conversion of a 26,100 square foot grocery store formerly owned by Cas Walker into an automotive body shop. The store was located on Chapman Highway in Knox County. The property owner retained Mr. Martin in early 1989 after he had been unable to obtain a building permit based the plans previously prepared by a draftsman. Mr. Martin was retained solely to prepare the plans; he did not contract to have any responsibility for construction administration. Apparently, the owner was able to obtain a building permit based on the plans prepared by Mr. Martin.

On March 6, 1989, Charles R. Widener, an inspector employed by the Knox County Fire Prevention Bureau, inspected the construction and discovered that the contractor had not complied with Mr. Martin's plans. Specifically, he discovered that the contractor had failed to extend several walls to the roof deck as required by Mr. Martin's plans and had installed an unrated residential garage door and had improperly installed an unrated entry door, even though Mr. Martin's plans called for a rated roll-up door between the two spaces in the building. Mr. Widener instructed the contractor to stop work. On March 22, 1998, and again on April 4, 1998, Mr. Widener informed Mr. Martin that he had issued a stop-work order and requested Mr. Martin to provide him with Underwriter's Laboratory design ratings for several of the interior walls.

Despite Mr. Widener's stop-work order, the contractor continued construction. At Mr. Widener's request, Mr. Martin accompanied Mr. Widener to the project and informed both the owner and the contractor that they should follow his plans and that they should stop work until the issues raised by Mr. Widener had been resolved. During an inspection of the project on May 3, 1998, Mr. Widener discovered that the project was completed and the building was occupied even though a certificate of occupancy had not been issued. No corrective measures had been taken regarding the deficiencies discovered on March 6, 1998.

The State asserted that Mr. Martin did not adhere to the applicable standards of professional practice because he did not withdraw from the project and because he failed to inform the Knox County Fire Prevention Bureau that the contractor was continuing to work on the project without correcting the construction deficiencies discovered on March 6, 1998. To prove these charges, the State called only Mr. Widener. Mr. Widener testified that he was a former fire fighter and that he had been employed by Knox County since 1986. He also stated that he had been certified as a fire inspector by the National Fire Prevention Association and the Southern Standard Building Code Congress and that his job was to conduct field inspections rather than to examine plans to spot deficiencies. He conceded that he was not a licensed architect or engineer and that he was not an expert regarding the standard of care applicable to architects whose clients refuse to abide by a stop-work order. Mr. Widener testified that he had "never seen a set of plans [that] came through our office complete . . . Some are a whole lot worse than others . . .." While he testified that Mr. Martin had been "generally cooperative," Mr. Widener stated that Mr. Martin's plans "had more deficiencies . . . [than] usual" and that he would rate the plans a "two, at best" based on a scale of one to ten.

In response to the State's case, Mr. Martin testified that he had been hired solely to prepare plans for the project and that he had not agreed to perform any sort of construction administration services for this project. He also stated that several of the walls questioned by Mr. Widener were

existing walls for which he was not required to provide rating information and that the construction details for the remaining walls were on his plans. Finally, he testified that he had fully performed his contract when he submitted the plans to the owner and, therefore, that he could not "withdraw" from the project after Mr. Widener issued the stop-work order. Mr. Martin also presented Mr. Holsaple's appraisal of his work on this project. Mr. Holsaple stated that the design of this project was "simple" and that Mr. Martin's plans for the project complied with the applicable standard of care. He also testified that an architect does not have the authority to stop the work and that all an architect can do in a situation like this one is to advise his or her client that the client has a problem. Under the circumstances of this project, Mr. Holsaple testified that there was nothing else that Mr. Martin could have done.

Based on this evidence, the Board concluded that Mr. Martin had departed from the applicable standards of professional practice (1) by failing to provide the design criteria for the rated walls requested by Mr. Widener, (2) by failing to report the owner's and contractor's activities to the proper authorities, and (3) by failing to withdraw from the project. We have determined that the record lacks substantial and material evidence to support these conclusions.

There is no competent evidence in this record identifying a design professional's obligations when a local building authority issues a stop-work order other than the testimony of Messrs. Martin and Holsaple. Mr. Widener is not qualified to render such an opinion and specifically disclaimed expertise regarding this matter. He also did not attempt to articulate the applicable standard of care or to explain how Mr. Martin's conduct departed from this standard. Accordingly, nothing in the record substantiates the State's claim that "a design professional remains responsible to appropriate authorities to bring a design into compliance with the codes even if the only contractual duty is to provide the design." In light of the record before us, we concur with the trial court's conclusion that the record does not contain substantial and material evidence to support the Board's conclusion that Mr. Martin's conduct on this project was contrary to the standards in Tenn. Comp. R. & Regs. r. 0120-2-.02(2).

**6.**

To summarize, we have concluded that the record contains substantial and material evidence to support only the Board's conclusion that Mr. Martin departed from the applicable standards of professional practice by preparing drawings for the Timbers Lodge and Old Village Shops project that did not contain plans for fire alarms, exit lights, and emergency lighting. In light of our conclusion that the State failed to present sufficient competent evidence regarding the remaining claims of unprofessional practice, we need not address the State's argument that the trial court did not give appropriate consideration to the total weight of the evidence with regard to Mr. Martin's performance on all four projects at issue.

The Board's decision to suspend Mr. Martin's license for three years and thereafter to place him on probation for one year was expressly premised on its conclusion that he had engaged in unprofessional conduct on all four projects at issue. In light of our conclusion that the State did not carry its burden with regard to three of these four projects and a significant portion of the fourth project, it would be inappropriate to surmise that the Board would have imposed the same punishment had Mr. Martin's only offense been to overlook including fire alarms, exit lights, and emergency lighting on one project. In cases where an administrative agency's decision is tainted by

error substantially affecting the outcome of the proceeding, the most appropriate remedy is to remand the case to the board with instructions that the agency carry out its statutory responsibilities in a manner consistent with its statutory authority. *Consumer Advocate Div. v. Tennessee Regulatory Auth.*, No. M1999-02151-COA-R12-CV, 2000 WL 13794, at * 2 (Tenn. Ct. App. Jan. 10, 2000) (No Tenn. R. App. P. 11 application filed); *Hoover, Inc. v. Metropolitan Bd. of Zoning Appeals*, 955 S.W.2d 52, 55 (Tenn. Ct. App. 1997). Accordingly, we remand the case to the Board with directions to determine, based on the present record, the discipline that should be imposed on Mr. Martin for his failure to include in the plans for the Timbers Lodge and Old Village Shops project provisions for fire alarms, exit lights, and emergency lighting.

## IV.

We affirm the judgment of the trial court except as modified in Section III. The case is remanded to the Board of Examiners for Architects and Engineers for further proceedings consistent with this opinion. The costs of this appeal are taxed to the Board of Examiners for Architects and Engineers.

_____
WILLIAM C. KOCH, JR., JUDGE