IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
JUNE 17, 2008 Session

## JAMES GLEAVES v. SHELBY COUNTY, TENNESSEE, ET AL.

Direct Appeal from the Chancery Court for Shelby County
No. CH-05-1318-3      Kenny W. Armstrong, Chancellor

No. W2007-02259-COA-R3-CV - Filed October 21, 2008

A former sheriff's deputy appeals his termination. The Shelby County Civil Service Merit Board
upheld the termination, and upon review, the chancery court found substantial and material evidence
to support the decision. We affirm.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which HOLLY M. KIRBY, J., and
WALTER C. KURTZ, SR. J., joined.

Thomas E. Hansom, Leigh H. Thomas, Memphis, TN, for Appellant

Martin W. Zummach, Germantown, TN, for Appellee

# OPINION

## I. FACTS & PROCEDURAL HISTORY

James Gleaves was a Shelby County Deputy Sheriff. The following two incidents led to his termination. First, on December 9, 2000, Deputy Gleaves was on duty and pulled over a vehicle driven by Dexter Creel, allegedly for driving with an inoperable tail light. According to Deputy Gleaves, the driver failed to stop when he turned on the patrol car's blue lights, and so Deputy Gleaves turned on the siren. Deputy Gleaves contends that he pursued Mr. Creel for seven tenths of a mile before Mr. Creel pulled over. Deputy Gleaves did not arrest Mr. Creel at that time, but he wrote Mr. Creel a ticket for the bad tail light and his failure to yield to an emergency vehicle.

Mr. Creel instituted a complaint against Deputy Gleaves, alleging that the officer yelled at him and yanked him out of the car. He further alleged that Deputy Gleaves threatened that if Mr. Creel did not pay the ticket, or if he complained to the Internal Affairs Bureau ("IA"), then the ticket would be thrown out and Mr. Creel would face felony charges of evading arrest. Mr. Creel complained to IA, and when Mr. Creel appeared in traffic court on January 24, 2001, Deputy Gleaves arrested him on the felony charge. Mr. Creel spent twenty-four hours in jail. After the arrest, Mr. Creel made a second complaint to IA. An internal affairs investigation was initiated.

A second, unrelated IA investigation began when Thomas Willett filed a complaint that Deputy Gleaves was stalking his seventeen year old daughter. According to the Willetts, Deputy Gleaves made frequent visits over a three month period to a restaurant where the minor worked, and when she obtained new employment, he also visited her there. Deputy Gleaves, uninvited, attended the minor's softball game and followed her when she left the game. Deputy Gleaves set up radar in an area so that he could view the minor's house located in Bartlett, Tennessee. Deputy Gleaves was arrested and charged with stalking on August 6, 2001.[1]

Deputy Gleaves was charged with violating the following Shelby County Government Rules and Regulations: RR 3.04 Conformance to Law (A); RR 3.02 Unbecoming Conduct; RR 3.39 Abuse of Process; RR 3.49 Arrest, Search and Seizure; and RR 3.37 Truthfulness (A) (B).

On September 27, 2001, two Loudermill hearings[2] were held concerning both of the aforementioned incidents. Deputy Gleaves' union representative was present and made a statement on Deputy Gleaves' behalf at both hearings. Deputy Gleaves was found guilty of violating the

---

[1] At oral argument, counsel for Deputy Gleaves stated that all stalking charges had either been dismissed or Deputy Gleaves had been found not guilty. We find nothing in the record as to this issue.

[2] The term "Loudermill hearing" stems from the United States Supreme Court's decision in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985). The Loudermill Court held that a public employee who can be discharged only for cause must be given notice and an opportunity to respond to the charges against him prior to termination. *Loudermill*, 470 U.S. at 546; *Case v. Shelby County Civil Service Merit Bd.*, 98 S.W.3d 167, 170, n.1 (Tenn. Ct. App. 2002).

following: RR 3.04 Conformance to Law (A); RR 3.39 Abuse of Process; RR 3.01 Unbecoming Conduct; and RR 3.49 Arrest, Search and Seizure. Deputy Gleaves was terminated effective October 1, 2001.

Deputy Gleaves appealed to the Civil Service Merit Review Board ("the Board"), and a hearing was held on April 20, 2005. Deputy Gleaves testified as to the traffic stop he made on December 9, 2000. He admitted at one point that Mr. Creel did not make any attempt to evade him, but he later testified that he believed Mr. Creel attempted to evade him "when he would not stop." Deputy Gleaves testified that he first turned on his blue lights, then turned on the siren when the driver did not pull over, and that "from the location that I started until the time [Mr. Creel] actually stopped, [it was] 3500 or 3800 something feet." Deputy Gleaves' explanation for failing to arrest Mr. Creel on the scene for felony evasion was that "I did not know if the Attorney General's office would prosecute it. I didn't want to put a man in jail over the weekend unnecessarily."

Deputy Gleaves testified further as to the traffic stop incident as follows:

> Q. Is it your testimony that you did not tell Mr. [Creel] at the traffic stop anything in substance to, "If you fight me on this ticket, I'll just have you arrested on a felony"?
> A. No, sir. I did not threaten him in that manner.
> Q. Did you threaten him in any other manner?
> A. No, sir.
> . . .
> Q. . . . When you took him into custody [ ] on the day of his traffic citation, court date, did you handcuff him?
> A. Yes, sir.
> Q. Right there in the courtroom you handcuffed him?
> A. Yes, sir.
> Q. And then when you handcuffed him, did you say, "I told you so"?
> A. No, sir. I handcuffed him after I'd advised the Judge of the circumstances while sitting in court that day as to why he was being taken into custody.

When asked if he knew that Mr. Creel complained about the stop prior to arresting him in court, Deputy Gleaves testified that "Captain Yancey spoke to me about a matter. I - - at this time I don't recall if it specifically was Mr. [Creel]. I've never seen a Complaint based on that event. . . ." Captain J.T. Yancey explained in a statement to IA, "I called Officer Gleaves and talked to him about the situation. I told him that in fact that if this did happen that I wanted it stopped . . . , but he said that's not the way it happened. I said well if it is it needs to stop.

As to how he obtained Mr. Creel's arrest warrant, Deputy Gleaves admitted that the first judge he sought out, Judge Broffitt, would not sign the warrant. He then went to a second judge,

Judge Robinson, and obtained the necessary signature. Judge Broffitt made the following statement to the IA investigator, which was entered into evidence:

> Q. Officer J. Gleaves came to you on the 24th of this month to obtain an arrest warrant [for Mr. Creel]. I'm gonna show you a copy of it. Do you remember this incident?
>
> A. I do.
>
> Q. Can you tell me what Officer Gleaves explanation was to get this warrant?
>
> A. He stated that he was sent to me by Ass[istant] District Attorney General Don Seimer from Division 14,[3] to obtain this arrest warrant, that at the time of the stop on December 9th, 2000, that the defendant had personal property in his vehicle, too much (inaudible) property in his vehicle and that's why he was not arrested at the time for the felony charge of Evading Arrest. I asked him to go talk with the Felony Prosecutors, and at that time he did, and I asked that they sign stating that they wished to proceed in prosecution. A few minutes later Officer Gleaves and Mr. Terry Harris returned to the court room. Mr. Harris informed me that he could not sign it because he did not have immunity, but he did wish to prosecute, and since he refused to sign it, I also refused to sign it, and I sent him to another court.
>
> Q. Apparently you had some reservations about whether the warrant was adequate any way?
>
> A. I did not like the idea that it was almost two months old for a felony arrest. It should have been made at the scene . . . if it was warranted.
>
> Q. That's the last discussion you had with either Terry Harris or Officer Gleaves?
>
> A. That is the last discussion.

Likewise, Assistant District Attorney General Donald Siemer gave a statement to IA, vastly different from Deputy Gleaves' account of the events:

> Q. Do you remember this citation being brought to you?
>
> A. Yes I do.
>
> Q. Can you tell me about the circumstances surrounding this citation?
>
> A. [ ] Mr. Gleaves or Officer Gleaves came up to me . . . thirty minutes before court at 10:30 because we had a 9:00 docket

---

[3] Deputy Gleaves denied that he told Judge Broffitt that Division 14 sent him to her courtroom.

[ ], and ah [sic] ask me to dismiss this particular case, ah that he intended to proceed with a misdemeanor citation on it. We did not have our regular Judge sitting, and so I told him that was fine, but he'd have to go to another Judge and have it done, so we did take this particular case and Nolle Pros it so that he [sic] could take affect of the other ticket, the misdemeanor citation he planned on writing, and ah he went away and later came back with that ticket.

Q.   Did he come back with the misdemeanor citation ticket or an arrest ticket?

A.   Well, I don't really know . . . because I didn't deal with the case from that point on.   . . . The only information that [Deputy Gleaves] gave me was that he at first, because [Mr. Creel] appeared to him to be evading him, ah [sic] was going to arrest the person, put him in the back of the squad car, and that in talking with [Mr. Creel] and doing further investigation decided he would write this ticket, and so that's what he did, but then upon further thought Mr. Gleaves decided that this was not the appropriate ticket to write and that he decided that he wanted to write a misdemeanor citation . . . .

Shelby County introduced Deputy Gleaves' IA record at the hearing, which noted several previous complaints initiated by various individuals. The two IA summary reports were also introduced. Lieutenant James R. Holland, who conducted the IA investigations, testified as to what he learned concerning Mr. Creel's complaint. Lieutenant Holland testified that Mr. Creel complained a second time after he was arrested in court on the felony charge, that Deputy Gleaves "approached him in the courtroom [and] said, 'There's a warrant for your arrest for felony evading. I told you I'd would [sic] do this.'"

As to the other incident involving the stalking allegation, Deputy Gleaves admitted to frequenting the restaurant where the minor was an employee and requesting at least once or twice to be seated in her section, but only "at her request." Deputy Gleaves testified that the minor told him that she was about to quit the restaurant and begin working at a sporting goods store. He admitted going to the sporting goods store on at least three occasions while the minor was working. As to the minor's softball games, Deputy Gleaves testified that he learned she played softball through general conversation. He admitted calling the minor's church in order to find out her team's schedule, but he contended that he did so at his girlfriend's request. As to setting up a speed trap near the minor's home, Deputy Gleaves testified that "I was sitting there shooting radar on her street. She had advised me in a previous conversation that she got some traffic tickets right in front of her house. . . . I figured if the Bartlett police got her a couple of times, this must be a good spot. . . . I had no idea whether [the minor] was there or not."

The Review Board upheld the termination. Deputy Gleaves filed a petition for writ of certiorari on August 1, 2007, in chancery court in Shelby County. The chancery court upheld the decision of the Board on September 5, 2007. The chancery court made the following findings of fact:

That on the night of the traffic stop involved in this case, Patrolman Gleaves threatened to file felony evading arrest charges against Dexter Creel if he complained about the officer's treatment on the night of the stop;

That after Mr. Creel complained to Internal Affairs about Patrolman Gleaves, Patrolman Gleaves arranged to have the traffic ticket dismissed and then, as promised, arranged for Mr. Creel's arrest on felony evading arrest charges;

That Mr. Creel's actions on the night of the traffic stop did not constitute in any way a felony evading arrest offense;

That Patrolman Gleaves' actions in arranging for the arrest of Mr. Creel following his internal affairs complaint constituted official misconduct, official oppression and abuse of process;

That Patrolman Gleaves made frequent visits over a three month period to Dixie Café where the 17 year old [minor] worked as a waitress and requested to be seated in her area;

That after [the minor] obtained employment at the Bass Pro Shop, Patrolman Gleaves visited the store to talk to [the minor];

That after learning that [the minor] played softball, Patrolman Gleaves, without being invited, attended one of her games and followed her for some distance in his patrol car after she left the game;

That after learning where [the minor] lived, Patrolman Gleaves set up radar at that location in a manner so that he had a clear view of [the minor's] home;

That this unwanted focus on [the minor] by Patrolman Gleaves led [her] father to secure an arrest warrant for stalking against Patrolman Gleaves;

That Patrolman Gleaves' conduct toward [the minor] was excessive and inappropriate for a law enforcement officer and amounted to unbecoming conduct in violation of Sheriff[']s Department policies.

That the imposition of stalking charges against Patrolman Gleaves was an embarrassment to the Sheriff's Department and constituted unbecoming conduct.

The chancery court concluded that there was a reasonable basis for Deputy Gleaves' termination and that there was substantial and material evidence in the record to support the Review Board's decision. This appeal timely followed.

## II. ISSUES PRESENTED

Deputy Gleaves raises the following three issues for our review, which we reorder:

1. Whether the chancery court applied the correct standard of review.
2. Whether the chancery court erred in upholding the Board's decision to terminate Deputy Gleaves because the decision is unsupported by substantial and material evidence.
3. Whether the Board violated Deputy Gleaves' due process rights "when it forced him to participate in a Loudermill hearing without legal counsel present and with criminal charges pending against him."

## III. STANDARD OF REVIEW

This is an appeal from the chancery court's judgment pursuant to a statutory writ of certiorari: "Anyone who may be aggrieved by any final order or judgment of any board or commission functioning under the laws of this state may have the order or judgment reviewed by the courts[.]" Tenn. Code Ann. § 27-9-101. More specifically, Tenn. Code Ann. § 27-9-114 provides that "[c]ontested case hearings by civil service boards of a county or municipality which affect the employment status of a civil service employee shall be conducted in conformity with contested case procedures under the Uniform Administrative Procedures Act, compiled in title 4, chapter 5, part 3[,]" and judicial review of that board's decision "shall be in conformity with the judicial review standards under the Uniform Administrative Procedures Act, § 4-5-322." The now familiar judicial review under the UAPA is as follows:

> The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> (5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.
> (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h).

Just as the trial court, we apply the substantial and material evidence standard when reviewing the agency's findings of fact. *City of Memphis v. Civil Service Comm'n of City of Memphis*, 238 S.W.3d 238, 243 (Tenn. Ct. App. 2007) (citing *Bobbitt v. Shell*, 115 S.W.3d 506, 509-10 (Tenn. Ct. App. 2003)). Under this standard, we must "review the record carefully to determine whether the administrative agency's decision is supported by 'such relevant evidence as a rational mind might accept to support a rational conclusion. . . . The evidence will be sufficient if it furnishes a reasonably sound factual basis for the decision being reviewed.'" *City of Memphis v. Civil Service Comm'n of City of Memphis*, 216 S.W.3d 311, 316-17 (Tenn. 2007) (quoting *Jackson Mobilphone Co., Inc. v. Tennessee Public Service Com'n*, 876 S.W.2d 106, 111 (Tenn. Ct. App. 1993)). The agency's determination of witness credibility is given great weight on appeal. *City of Memphis*, 238 S.W.3d at 243.

## IV. DISCUSSION

### A. Standard of Review by the Chancery Court

Deputy Gleaves contends that the chancery court "failed to appropriately apply the applicable standard of review." He contends that the lower court "looked into scenarios not in evidence[.]" Under the UAPA, the chancery court reviews the administrative agency's decision by looking to the administrative record. *Id.* at 242. We conclude that the chancery court correctly limited its review to the administrative record. Deputy Gleaves also contends that the chancery court "accepted assertions factually disputed [ ] and ignored certain facts which were already established." He does not elaborate as to which facts the chancery court supposedly ignored. Deputy Gleaves contends that the chancery court "came to conclusions incongruent with the record[,]" but this statement is incorrect. While it is true that the court came to conclusions incongruent with Deputy Gleaves' version of the events, as discussed in the next section of this opinion, its conclusions are supported by other evidence in the record. The chancery court was in no better position than we are to second guess the agency's witness credibility determinations. The record establishes that the chancery court applied Tenn. Code Ann. § 4-5-322, and thus, this argument has no merit.

### B. Substantial and Material Evidence

Next, Deputy Gleaves argues that the Review Board's decision is not supported by substantial and material evidence, pointing to the testimony of Officer Bradley Yugaly and Officer Debra Scott. We disagree.

Officer Yugaly testified that he went to the scene at the time Deputy Gleaves pulled over Mr. Creel. He stated that Mr. Creel could have pulled over on the side of the road instead of continuing and stopping in a parking lot. When asked why he did not tell the IA investigator that Mr. Creel had the opportunity to stop, Officer Yugaly explained, "[w]ell - - I mean, that's been over two years. I'm

a little more - - I can - - I can - - I'm a little more detailed now. Well, I mean, I - - ." When asked "you're here to help Officer Gleaves, aren't you?", Officer Yugaly admitted, "[s]ir, I guess so."

Officer Scott testified that she dated Deputy Gleaves during the period of the alleged stalking of the minor, but she said they were just friends at the time of the hearing. She testified that Deputy Gleaves met her on the night of December 9, the night he pulled over Mr. Creel. She claimed that Deputy Gleaves told her of his intent to see the DA to inquire if felony charges would be appropriate. As to the allegations involving the minor, Officer Scott testified that she sent Deputy Gleaves to the sporting goods store where the minor worked to inquire about purchasing a boat. She further contended that she had an interest in softball, and told Deputy Gleaves to find out the minor's schedule so "all of us could go to the ball game." On cross examination, Officer Scott admitted that she did not know the specifics of the stalking charges, that she only knew what he told her, and "what he told me was sufficient. I didn't believe any of it." She testified that Deputy Gleaves told her that he ran radar in the Bartlett area because the minor's family "had complained about having speeders in the area. And he had run radar for it, specifically for that."

We agree that the Board's decision is supported by substantial and material evidence. The Board implicitly made a credibility determination, discrediting Officer Yugaly and Officer Jones' testimony, and we are not in a position to second guess that determination. We note, however, that both of these witnesses were impeached several times and quite inconsistent. We have conflicting evidence concerning the two incidents in question. The fact that the evidence could also support another result does not justify reversal of an administrative decision. *City of Memphis*, 238 S.W.3d at 243 (citing *Martin v. Sizemore*, 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001)); *see also* Tenn. Code Ann. § 4-5-322(h)(5)(B) (disallowing this Court to substitute its own judgment on questions of fact by re-weighing the evidence.). There is more than ample evidence in the record to support the agency's decision.

### C. Due Process

Finally, Deputy Gleaves argues that his constitutional due process rights were violated "when he was forced to participate in his Loudermill hearing with the Internal Affairs Bureaus investigation without legal counsel and with criminal charges pending against him." First, we see nothing in the record indicating that Deputy Gleaves sought legal representation, as opposed to his union representative, at the Loudermill hearing. More importantly, Deputy Gleaves has cited no authority standing for his proposition that a continuance must be granted at a Loudermill hearing if criminal charges are pending. In any event, the Board gave Deputy Gleaves a continuance while the stalking charges were pending, and Deputy Gleaves was represented by counsel at the Board hearing. This argument is meritless.

## V. CONCLUSION

For the aforementioned reasons, we affirm.  Costs of the appeal are assessed against the appellant, James Gleaves, and his surety for which execution may issue if necessary.

_____

ALAN E. HIGHERS, P.J., W.S.