IN THE COURT OF APPEALS OF TENNESSEE
AT  KNOXVILLE
February 24, 2015 Session

## STUART H. KAPLOW, ET AL. v. CITY OF GATLINBURG BOARD OF ADJUSTMENTS AND APPEALS, ET AL.

Appeal from the Circuit Court for Sevier County
No. 2012-1311-III          Rex Henry Ogle,  Judge

---

### No. E2014-00347-COA-R3-CV-FILED-JUNE 30, 2015

---

Housing units belonging to the property owners were cited by a city official for condemnation.  The property owners appealed to the city's Board of Adjustments and Appeals.  After the board agreed with the city official and condemned the property, the property owners filed a petition for common law writ of certiorari seeking judicial review of the board's decision.  The trial court determined that the decision of the board was supported by material evidence and was neither arbitrary nor capricious.   The property owners appeal.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J., joined.

Arthur G. Seymour, Jr., and Matthew A. Grossman, Knoxville, Tennessee, for the appellants, Stuart H. Kaplow and Maury R. Greenstein.

John T. Batson, Jr., and Brian R. Bibb, Knoxville, Tennessee, for the appellees, City of Gatlinburg Board of Adjustments and Appeals, City of Gatlinburg, Ralph Maples, David Hadden, Gary Shultz, Mike Smelcer, and Mitch Ayers.

**OPINION**

### I.  BACKGROUND

This appeal concerns certain low income rental property owned by Maury R. Greenstein and leased by Stuart H. Kaplow (collectively, "the Property Owners") at 426 Ski Mountain Road ("the Property") in Gatlinburg, Tennessee ("the City").   The

Property, built during the 1940s, was condemned by order of Deputy Building Official Jay Horner on October 2, 2012; the City's Board of Adjustments and Appeals ("the Board") affirmed the order of condemnation on November 8, 2012, finding the Property to be in violation of the International Property Maintenance Code ("the IPMC").[1]

Horner identified various structural deficiencies and concluded that there was "an imminent danger of somebody - something failing, somebody getting hurt." He contacted structural engineer Todd Duncan to further inspect the Property. The structural defects were detailed by Duncan as follows:

**Building D**

> The concrete ramp providing access to the second level is damaged and in poor condition. It was not constructed properly and is possibly inadequate to allow safe egress from the building in the event of an emergency. The ramp is deteriorated, the rebar is rusted and exposed, and the concrete is chipping. Underneath the building, an exposure has been made to allow a creek to run below the structure, and the concrete pipe that the creek runs through is severely deteriorated and the steel reinforcement exposed. The pipe which the water runs through was placed in such a way as to support the load of the building. The second floor balcony is exhibiting structural deficiencies with cracks in the concrete caused by freezing. This raises the risk of serious injury or death from falling and reduces the "actual load capacity of the cantilevered slabs [which] may be less than needed to support the weight of the occupants." The concrete slab above the mechanical room is in a serious state of deterioration. It had previously been sealed off but has since been opened and is unsafe for residents to walk on. The mechanical room is in poor repair and creates both circumstances for decay and microbial growth along with a weakening of the structural integrity of the building itself. Other issues include the sealing of a gap around an air conditioning unit with non-treated plywood and the deterioration of the gutter system.

---

[1] The City adopted the IPMC on September 19, 2006.

**Building E**

This building also contains a storm drain pipe which runs underneath it which is forced to support, in part, the load of the building itself. Because of the decay of the storm drain pipe, "there are concerns the aged pipe has partially collapsed in the area below Building E allowing water to erode the soil supporting the building foundation and floor slabs." As in Building D, the steel reinforcement of the pipe is coming into contact with the storm water and beginning to deteriorate.

**Building F**

Of particular concern is a deteriorated retaining wall rising ten to fifteen feet from the creek below that supports a sidewalk adjacent to Building F. The retaining wall supports the concrete walkway, which is an exit corridor for Building F. At the base of the retaining wall, several pieces of a slab have fallen off, and the soil on which the concrete retaining wall sits is beginning to wash out, calling into question the structural integrity of the wall itself. As a result of the damage to the retaining wall, the concrete slab upon which Building F is based has slipped five or six inches. There is also a one inch gap created on the block mortar joint on the outside of Building F. Duncan notes that failures present at the base of the stone wall indicate that it is not supported by a continuous concrete foundation and results in the loss of support for the concrete walkway above. Portions of the rock base of the stone wall have fallen off into the creek bed and the soil at the bottom of the wall is beginning to wash out. Because of the failure of the stone retaining wall, both the north exterior wall of Building F and the concrete walkway slabs along the exterior are beginning to move. Significant gaps of between one and six inches are forming on the concrete slab and at the interior and exterior joints. Duncan concludes: Based on the age of the existing stone retaining wall, lack of structural continuity and stone construction, magnitude and quantity of damage and failures along the length of the wall, as well as, the loss of support for the building foundation and the safety of the occupants, the wall

must be removed and replaced with a new, adequately designed and constructed wall to resist the applied forces. Duncan also notes that the roof of Building F is in very poor condition and is showing signs of separation, breaking and decay.

### Building G

This building has issues with separation of the roof structure evidencing a lack of maintenance. Duncan notes severe deficiencies with the condition of the roof, including a "deflected shape" that indicates localized failure of the roof structure. Duncan identifies other serious issues with the roof and end gable of Building G, including a lack of gutters adjacent to certain portions of the roof.

### Building H

Duncan notes that the concrete masonry has been removed to allow the installation of small window air conditioning units, but the gap between the air conditioning units and the existing masonry is not properly reconstructed. Instead, untreated wood was used to block the gap.

In his written report presented to City Attorney James Ripley, Duncan made the following conclusion:

The itemized damage revealed a significant concern for the safety of the occupants and guests. The noted damage is a product of substandard maintenance and upkeep, which has resulted in the loss of structural integrity to the buildings. Uncorrected, the noted conditions will worsen with possible localized failures and/or collapse of the structures.

Horner thereafter concluded that the buildings were unfit for occupancy and the appropriate course of action was to condemn the Property pending remediation of the structural deficiencies. The letter of condemnation was hand delivered to Kaplow on October 2, 2012.

The Property Owners appealed the condemnation to the Board. However, the only evidence they presented at the hearing was an unauthenticated e-mail from a consulting engineer, Paul Tucker, who essentially agreed in principle with Duncan's findings; Tucker differed with Duncan regarding the severity of the structural issues and whether the buildings should be demolished. After hearing testimony from Horner and Duncan, and reviewing Duncan's report with attached photographs, the Board unanimously affirmed the condemnation decision.

After the hearing before the Board, the Property Owners filed this certiorari action on November 16, 2012, followed by deposition notices for each individual Board member. Subsequently, a motion to quash and for a protective order filed by the City was granted by the trial court. The writ of certiorari was denied nearly a year later on October 8, 2013. The court affirmed the decision of the Board, finding it did not act arbitrarily, capriciously, or illegally and that its decision was supported by substantial and material evidence. Property Owners appeal.

## II. ISSUES

We restate the issues raised by the Property Owners in this appeal as follows:

1. Whether the failure of the City to put all "owners" of the Property (as the City defines the term in its own ordinances) on notice of the condemnation proceedings with respect to the Property, constitutes a due process violation requiring the vacation of the condemnation, when the same municipal ordinances mandate that the City provide all owners of notice of the condemnation by hand-delivery, mail, or posting on the property, and when it is undisputed that the City undertook no efforts to perfect such notice upon all such parties.

2. Whether Horner's ex parte communications with the members of the Board hearing the appeal from the condemnation order, with respect to the substance of the condemnation order, constitutes a due process violation, when the Board renders a decision adverse to the Property Owners, and when no building official, nor the Board, nor the trial court conducting certiorari review, allows the Property Owners to discover the nature of the ex parte communications or other bias affecting the decision-making process of the Board.

3. Whether the Board's belief that the City Attorney representing the City in an adversarial proceeding represents the Board, coupled

with that Board's overt reliance upon legal advice of the City Attorney, to the detriment of the Property Owners appearing before the Board, constitutes a due process violation, when the Board follows the City Attorney's advice to the prejudice of the City Attorney's adversary.

4. Whether the Property Owners seeking certiorari review of an adverse decision of the Board, who seek relief upon the grounds of improper ex parte communications between the Board and a building official, are entitled to conduct discovery regarding the nature of the ex parte communications with the members of the Board and as to the Board's bias, when the Board refused to provide any disclosures as to the ex parte communications or bias.

## III. STANDARD OF REVIEW

The proper vehicle for review of the Board's decision is the common law writ of certiorari. *McCallen v. City of Memphis*, 786 S.W.2d 633, 639 (Tenn. 1990). A common law writ of certiorari is an extraordinary judicial remedy. *State v. Lane*, 254 S.W.3d 349, 355 (Tenn. 2008). Judicial review available under a writ of certiorari is quite limited, and is confined only to determining whether the entity whose decision is being reviewed exceeded its jurisdiction, followed an unlawful procedure, acted illegally, arbitrarily, or fraudulently, or acted without material evidence to support its decision. *Heyne v. Metro. Nashville Bd. of Pub. Educ.,* 380 S.W.3d 715, 729 (Tenn. 2012); *Lewis v. Bedford Cnty. Bd. of Zoning Appeals*, 174 S.W.3d 241, 245 (Tenn. Ct. App. 2004) (citing *Willis v. Tenn. Dep't of Correction*, 113 S.W.3d 706, 712 (Tenn. 2003)). Our appellate courts have explicitly approved the use of the common law writ of certiorari to provide judicial relief from (1) fundamentally illegal rulings, (2) proceedings inconsistent with essential legal requirements, (3) proceedings that effectively deny parties their day in court, (4) decisions that are beyond the decision-maker's authority, and (5) decisions that involve plain and palpable abuses of discretion. *Lane*, 254 S.W.3d at 355 (quoting *Willis*, 113 S.W.3d at 712. The common law writ of certiorari is not designed to correct errors of fact, law, or procedure. It contemplates only "fundamental illegalit[ies]." *McGee v. State*, 340 S.W.2d 904, 906 (Tenn. 1960) (the writ "may not be resorted to for the correction of technical or formal errors, not affecting jurisdiction or power, or for the correction of defects that are not radical, amounting to an illegality that is fundamental, as distinguished from an irregularity.").

A common law writ of certiorari proceeding does not empower the courts to redetermine the facts found by the entity whose decision is being reviewed. *Tennessee*

- 6 -

*Waste Movers, Inc. v. Loudon Cnty.,* 160 S.W.3d 517, 520 n. 2 (Tenn. 2005); *Cooper v. Williamson Cnty. Bd. of Educ.*, 746 S.W.2d 176, 179 (Tenn. 1987). Accordingly, a common law writ of certiorari does not authorize a reviewing court to evaluate the intrinsic correctness of a governmental entity's decision. *See, e.g., Stewart v. Schofield*, 368 S.W.3d 457, 465 (Tenn. 2012); *Arnold v. Tennessee Bd. of Paroles*, 956 S.W.2d 478, 480 (Tenn. 1997). Similarly, reviewing courts may not reweigh the evidence or substitute their judgment for the judgment of the entity whose decision is being reviewed. *See, e.g., Lane*, 254 S.W.3d at 355.

Ascertaining whether a record contains material evidence to support a board's decision is a question of law. *Leonard Plating Co. v. Metro. Gov't of Nashville & Davidson Cnty.*, 213 S.W.3d 898, 904 (Tenn. Ct. App. 2006). For the purpose of this inquiry, "material evidence" is relevant evidence that a reasonable person would accept as adequate to support a rational conclusion. *Hedgepath v. Norton*, 839 S.W.2d 416, 421 (Tenn. Ct. App. 1992). The amount of material evidence required to support an agency's decision "must exceed a scintilla of evidence but may be less than a preponderance of the evidence." *Leonard Plating Co.*, 213 S.W.3d at 904. Because the sufficiency of the material evidence in a common law writ of certiorari proceeding is a question of law, the courts must review the record de novo without presuming that the findings are correct. *Lafferty v. City of Winchester*, 46 S.W.3d 752, 759 (Tenn. Ct. App. 2000).

A trial court's decisions concerning discovery are reviewed on appeal under an abuse of discretion standard. A trial court abuses its discretion when it applies an incorrect legal standard or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining. *Jones v. LeMoyne-Owen College*, 308 S.W.3d 894, 908 (Tenn. Ct. App. 2009). The "abuse of discretion" standard does not permit an appellate court to substitute its judgment for the trial court's judgment. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011). As the Tennessee Supreme Court has explained:

> Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by the evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions.

*Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citations omitted); *see also Wilson v. State*, 367 S.W.3d 229, 235 (Tenn. 2012); *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105-06 (Tenn. 2011); *Elliott v. Cobb*, 320 S.W.3d 246, 249-50 (Tenn. 2010).

## IV. DISCUSSION

### A.

The Property Owners do not assert that the decision of the Board was not supported by material evidence. Rather, they focus on perceived procedural deficiencies:

(1) Horner engaged in ex parte communications with at least one member of the Board and, on motion, no member recused himself;

(2) The Board denied the motion of the Property Owners for a continuance;

(3) The tenants affected by the condemnation were not given proper notice;

(4) The Board refused to hear all factual and legal arguments that the Property Owners wanted to present;

(5) The Board refused to hear from all present tenants affected by the condemnation;

(6) The Board identified counsel for City as its own legal counsel; and

(7) The Chairman of the Board had an alleged conflict of interest because he owns weekly rental property in the City.

- 8 -

The Property Owners contend that the due process violations cited above so taint the Board's decision that we must vacate it. They also contend that the trial court's denial of their attempt to conduct discovery amounts to an abuse of discretion. According to the City, when a "court finds any material evidence to sustain the findings that are made, the court must affirm the board or commission." *Houston v. Memphis and Shelby Cnty. Bd. of Adjustment,* 488 S.W.2d 387, 388 (Tenn. Ct. App. 1972). If "any possible reason" exists justifying the action, it will be upheld. *McCallen*, 786 S.W.2d at 641.

In this case, the Board's decision was supported by material evidence. Horner examined the Property and observed serious violations of the IPMC. In order to perform a comprehensive study of the Property, Horner retained Duncan, an independent structural engineer, who prepared and submitted a written report confirming Horner's findings. Taking into consideration Duncan's conclusions along with his own, Horner determined that violations of the IPMC existed warranting condemnation of the Property pending remediation of the structural deficiencies.

At the hearing, rather than attempt to rebut the findings and conclusions of Horner and Duncan, the Property Owners alleged bias. Interestingly, the e-mail from Tucker, the independent engineer consulted by the Property Owners, in large part concurred with Duncan's determinations. In the meantime, the Board members actively engaged with Duncan and questioned him as to the photographs he took of the Property and the severity of the conditions; they also heard testimony from Horner. The record reveals that the Board had ample material evidence before it. The trial court correctly concluded that the decision of the Board was supported by material evidence and was neither arbitrary nor capricious.

**B.**

The Property Owners next raise an issue as to notice required by the IPMC:

> 107.1  **Notice to person responsible.**  Whenever the code official determines that there has been a violation of this code or has grounds to believe that a violation has occurred, ***notice shall be given*** in the manner prescribed in Sections 107.2 and 107.3 ***to the person responsible for the violation*** as specified in this code. Notices for condemnation procedures shall also comply with Section 108.3.

> 107.2  **Form.**  Such notice prescribed in Section 107.1 shall be in accordance with all of the following:

1.  Be in writing.

2.  Include a description of the real estate sufficient for identification.

3.   Include a statement of the violation or violations and why the notice is being issued.

4.   Include a correction order allowing a reasonable time to make the repairs and improvements required to bring the dwelling unit or structure into compliance with the provisions of this code.

5.  Inform the property owner of the right to appeal.

6.   Include a statement of the right to file a lien in accordance with Section 106.3.

107.3 **Method of service.**  Such notice shall be deemed to be properly served if a copy thereof is:

1.  Delivered personally;

2  Sent by certified or first-class mail addressed to the last known address; or

3.  If the notice is returned showing that the letter was not delivered, a copy thereof shall be posted in a conspicuous place in or about the structure affected by such notice.

(Emphasis added.).  The Property Owners claim that the hearing conducted before the Board did not conform with due process because the actual tenants were not served with notice.  They contend that the tenants should be considered "owners" under the applicable provisions of the IPMC.

The IPMC defines terms at § 202:

**OWNER.** Any person, agent, operator, firm or corporation having a legal or equitable interest in the property; or recorded in the official records of the state, county or municipality as holding title to the property; or otherwise having control of the property, including the guardian of the

- 10 -

estate of any such person, and the executor or administrator of the estate of such person if ordered to take possession of real property by a court.

**OCCUPANT.** Any individual living or sleeping in a building, or having possession of a space within a building.

**TENANT.** A person, corporation, partnership or group, whether or not the legal owner of record, occupying a building or portion thereof as a unit.

IPMC § 202.

The IPMC reveals that the "owner" is the person responsible for the maintenance of the premises and must ensure that the structures comply with the Code provisions. IPMC §§ 102.2; 301.2. In this case, where multi-unit housing is involved, the "owner" is responsible for maintaining the premises as a whole, whereas the "occupant" or "tenant" of a unit is responsible for maintaining only his or her individual unit:

> 301.2 **Responsibility.** The owner of the premises shall maintain the structures and exterior property in compliance with these requirements, except as otherwise provided for in this code. A person shall not occupy as owner-occupant or permit another person to occupy premises which are not in a sanitary and safe condition and which do not comply with the requirements of this chapter. Occupants of a dwelling unit, rooming unit or housekeeping unit are responsible for keeping in a clean, sanitary and safe condition that part of the dwelling unit, rooming unit, housekeeping unit or premises which they occupy and control.

IPMC §301.2. The Code provisions clearly reveal that it is the "owner" who is to be noticed under IPMC § 107.1 et. seq. of a violation on the Property, and it is the "owner" who is to be informed of the right to appeal. IPMC §107.2(5). When a decision to condemn property is made, notice is to be "served on the owner[.]" IPMC § 108.3. Pursuant to the language of the IPMC, there is no support for the contention that the tenants were entitled to notice of condemnation.

The Board did hear from Jeremy Bliss, the Property's former manager/"maintenance man" and tenant. Rather than address the conditions of the Property, Bliss's testimony stressed the fact that the tenants needed a cheap place to live and how unfair it would be to evict them. After hearing from Bliss, the Board decided that it had heard enough and that the hearing needed to be concluded:

CHAIRMAN MAPLES: Gentlemen, what's your pleasure? Are we going to sit here and listen to all these people getting throwed out or are we going to

MR. SHULTZ: I think it's come to this point that Gatlinburg has had to force his hand to make him fix something. That's what it sounds --

CHAIRMAN MAPLES: Well --

MR. SHULTZ: But they've got to do something to get him to do something, and that's where he's at right now. That's what I'm talking about.

As noted by the City, even if notice had been sent to each and every tenant, the events that transpired at the hearing would not have been any different. The testimony offered regarding the social and economic impact on the tenants addressed matters beyond the Board's scope of review and out of its control. The Board complied with the IPMC and reached a decision supported by material evidence. No fundamental illegalities have been raised.

## C.

According to the Property Owners, a conflict of interest was created by purported ex parte communications between Horner and at least one Board member. At the hearing, counsel for the Property Owners asked Horner if he had spoken with any member of the Board outside of the courtroom:

> Q. Have you ever spoken with anybody on this board about - outside of this courtroom have you ever spoken to any member of this board about any building belonging to Mr. Kaplow or Mr. Greenstein?
>
> A. I probably have, yes, sir.

An argument ensued concerning the permissibility of this line of questioning. When questioning resumed, counsel for the Property Owners inquired:

> Q. Do you remember any specific conversations you had with members of this board about any Kaplow building?
>
> A. I'm not going to say yes, because I don't remember any specific conversations.

Q. You said earlier you have had-

A. I would probably say we've had discussions about it in, like off the cuff information.

Q. What sort of things would you have said about Mr. Kaplow in those conversations?

A. Sir, I don't know. I don't remember. I don't have - I mean, I don't know if I was questioned about it. I don't know if it came up. You're asking me something I do not know.

Q. Is it possible you told a member of this board outside of this courtroom that the Kaplow buildings were not up to code?

A. That would probably be possible, yes.

Before the Board at the hearing was the validity of the notice issued by Horner containing both his findings and those of Duncan. The Board therefore was aware that Horner believed the buildings were not in compliance with the IPMC, because the notice from which the appeal in question was filed specifically stated such. The Board was entitled to review Horner's and Duncan's opinions set out in the notice which formed the basis for the decision to condemn the Property. Any verbal representation by Horner that the Property was not in compliance with the relevant code would have given the members no more information than that to which they already had access. Furthermore, the Board members had sufficient evidence, properly introduced and largely unrebutted, upon which to base their decision regarding the Property. The trial court correctly concluded that the administrative record showed no bias.


**D.**

It is claimed by the Property Owners that the Board's identification of City Attorney Ripley as its legal counsel requires vacation and remand:

> CHAIRMAN MAPLES: The board's attorney is the city's attorney.

> CHAIRMAN MAPLES: What's our attorney's name there? Jim, let me ask you something.

Due process does not require all the structural safeguards in administrative and civil adjudicatory proceedings that we have come to expect in criminal proceedings. *See*

2 Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.9, at 679 (4th ed. 2002). Accordingly, while the separation of investigative, prosecutorial, and adjudicative functions is a hallmark of criminal proceedings, due process does not require the strict adherence to separation of functions in civil matters. *See Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976); 32 Charles A. Wright & Charles H. Koch, Jr., *Federal Practice and Procedure* § 8259, at 469 (2006). Accordingly, some combination of overlapping of functions in an administrative proceeding is not inconsistent with fundamental fairness. *Martin v. Sizemore*, 78 S.W.3d 249, 264 (Tenn. Ct. App. 2001). The dual role Attorney Ripley played in the proceedings therefore is not sufficient, by itself, to establish a due process violation. A party may succeed with a due process claim if it can present special facts and circumstances demonstrating that the risk of actual bias in a particular proceeding is intolerably high. *Id.* at 265.

The City Attorney represents all administrative arms and committees of the City. City of Gatlinburg Charter § 11. Under the facts of this case, no evidence was presented that the Board gave undue or unnecessary credence to Attorney Ripley's suggestions or opinions. In fact, the Board disregarded his suggestion that it had the discretion to reset the hearing if it had concerns about removing the tenants from the Property. The record reveals no colorable evidence of improper influence by the City Attorney on the decision-making process of the Board.

Similarly, the Property Owners contend that the Board's identification of Ripley as its attorney caused the denial of their motion for a continuance of the hearing date. In response to the request for a continuance, primarily based on the unavailability of co-counsel, Ripley noted that the language of the IPMC required hearing within 20 days of the filing of an appeal and reminded the Board regarding the health and welfare of the tenants of the Property. He informed the Board that it could continue the hearing if it so desired:

> MR. RIPLEY: There's one possibility here, and I'm not asking you to do this, but in fairness I'm going to point out that the code says that while these matters are on appeal before you, the action of the city is stayed, meaning while this is before you.
>
> I suppose one possibility could be to reset this matter for further hearing on another date, give them opportunity in the interim to come in with -- or to present plans to Mr. Horner. Now, you know, that's a possibility. And then you reconvene your hearing and look at it at that point.

- 14 -

After considering arguments made by counsel, the Board unanimously agreed to go forward with the hearing within the guidelines of the IPMC and while the evidence and witnesses were present and ready to proceed.

The Property Owners also claim the Board acted inappropriately when it determined that the applicable provisions of the IPMC required that a hearing be held within 20 days of the notice of appeal. IPMC § 111.1 requires filing of a written notice of appeal within 20 days of service of the notice. The notice in this case was served October 2, 2012. IPMC § 111.3 provides that the Board shall meet to consider a filed appeal either within 20 days of the notice of appeal or at the stated periodic meeting. The notice of appeal was filed October 22, 2012. The hearing was scheduled for and held on November 8, 2012. The Board holds regular meetings on the fourth Thursday of each month, but the fourth Thursday of November 2012 fell on Thanksgiving. The Board concluded that it needed to have a hearing within 20 days of the filing of the notice of appeal to avoid needlessly delaying the resolution of this case. Its interpretation of its own regulations and ordinances at issue is entitled to deference.

Further, the Board's decision to proceed with the hearing on the date it was originally noticed and scheduled was based on material evidence, supported by reason, and was neither arbitrary nor capricious. The Property Owners were represented by competent counsel, and the Board's denial of their request for a continuance was neither arbitrary nor capricious. Accordingly, the failure to grant a continuance is not a ground to remand this case to the Board. The evidence before us does not indicate that there would be a different result if the cause were reversed.

### E.

The trial court denied the Property Owners the opportunity to conduct discovery to determine the nature and extent of ex parte communications between Horner and the Board.

Common law certiorari provides appellate review of the decision of an administrative tribunal. Thus, discovery as a general proposition has no place in a certiorari review action: "the reviewing court should determine from the evidence filed before the lower tribunal whether that tribunal acted arbitrarily, illegally or without material supporting evidence." *Huddleston v. City of Murfreesboro*, 635 S.W.2d 694, 696 (Tenn. 1982) (citing *Lansden v. Tucker*, 321 S.W.2d 795 (Tenn. 1959)).

The trial court correctly prohibited the taking of discovery depositions in this case:

> But the bottom line is that there must be, I think, more than
> the mere allegations. Just mere allegations in and of

themselves without any substantiation, I don't think brings it to the level where the Court can order depositions . . . . [J]ust assuming, for example, that Mr. Maples has a similar type business, does not in and of itself create a conflict of interest . . . . The other issue about the ex parte communications, they're not held to the same standards . . . . [T]he Court does not feel that based upon what the Court has heard this morning, that there is any reason for this Court to - - to decline to follow the general rule on - - on forbidding depositions in these types of cases. So for that reason, the Court must respectfully grant the motion to quash the notice of deposition.

As indicated in the trial court's ruling, the Property Owners asserted that they would have questioned the Board members on two issues: (1) The purported conflict of interest of Maples; and (2) the alleged ex parte communications between the Board and Horner. In regard to Maples' supposed conflict of interest, they failed to make a motion for his recusal before the Board. Thus, they have waived any argument on appeal that Maples had a conflict. *See Guess v. City of Manchester*, M2001-00250-COA-R3-CV, 2010 WL 4629594, at *4 (Tenn. Ct. App. Nov. 15, 2010) (deeming the argument that a member of an administrative board had a conflict of interest waived when no motion for recusal was made before the board). Furthermore, Maples did not represent a deciding or determinative vote, as the Board's decision was unanimous. Thus, even if it could be established that Maples was biased, that showing would be insufficient to invalidate the Board's decision. *Humana of Tenn. v. Tennessee Health Facilities Comm'n*, 551 S.W.2d 664, 669 (Tenn. 1977) (holding that the bias of one board member does not invalidate a board's decision where a majority vote and quorum still exist absent the allegedly biased member). We have previously addressed the immaterial nature of the allegations of ex parte communications on the part of Horner. The trial court did not abuse its discretion in declining to deviate from the standard rule prohibiting discovery in certiorari review cases.

Under the standards applicable to certiorari review, the trial court correctly affirmed the decision of the Board.

# V.  CONCLUSION

The decision of the trial court upholding the findings of the Board is affirmed. The trial court did not abuse its discretion in quashing the notices of deposition filed for the individual members of the Board.  Costs on appeal are assessed to the Appellants, Stuart H. Kaplow and Maury R. Greenstein.


_____
JOHN W. McCLARTY, JUDGE